729 A.2d 1041 (1999)
321 N.J. Super. 558
Diana VELAZQUEZ, an infant by her guardian ad litem, Barbara VELAZQUEZ, and Barbara Velazquez and Luis Velazquez, Individually, Plaintiffs-Appellants,
v.
Ronald PORTADIN, M.D., Newcomb Medical Center, Eileen Cinotti, R.N., and Ann Spoltore, R.N., Defendants-Respondents, and
Michelle Torchia, M.D., Patricia Knecht, R.N., and Vineland Obstetrical & Gynecological Professional Associates, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 23, 1999.
Decided June 1, 1999.
*1043 Carol L. Forte, Chatham, for plaintiffs-appellants (Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte, attorneys; Ms. Forte, on the brief).
Thomas B. Leyhane, Lawrenceville, for defendant-respondent Ronald Portadin, M.D. (Mary Elizabeth Gazi, on the brief).
Herbert Kruttschnitt, III, Brick, for defendant-respondents Eileen Cinotti, R.N., and Newcomb Medical Center (Grossman, Kruttschnitt, Heavey & Jacob, attorneys; Mr. Kruttschnitt, III, and Roberta DiBiase, Belleville, on the brief).
Timothy M. Crammer, Pleasantville, for defendant-respondent Ann Spoltore, R.N. (Paarz, Master, Koernig, Crammer, O'Brien, Bishop & Horn, attorneys; Mr. Crammer, on the brief).
Before Judges KEEFE, EICHEN, and COBURN.
*1042 The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiffs Diana Velazquez, an infant by her guardian ad litem Barbara Velazquez, and Barbara and Luis Velazquez, individually, appeal from a jury verdict in this medical negligence case in favor of defendants Ronald Portadin, M.D., Newcomb Medical Center, Eileen Cinotti, R.N., and Ann Spoltore, R.N.[1]
Although the trial spanned fourteen days, the following brief summary of the facts will suffice as a backdrop for the issues raised on appeal.
At about 8:00 a.m. on August 18, 1990, plaintiff came under the care of defendant *1044 Portadin, a board-certified obstetrician, for the first time. Soon after plaintiff's admission to Newcomb Medical Center, an electronic fetal monitor belt was strapped around her abdomen. A fetal monitor produces a continuous paper strip. The baby's heartbeat is printed along the top of the strip and, simultaneously, the pattern of the mother's uterine contractions is printed along the bottom of the strip.
At 1:30 p.m., Portadin ascertained that plaintiff's cervix was fully dilated. Dissatisfied with the frequency and intensity of her uterine contractions, Portadin directed the administration of Pitocin. This drug increases the frequency and intensity of uterine contractions and, as a result, increases the amount of uterine force exerted upon the baby, which in turn reduces the flow of oxygen to the baby during contractions.
Shortly after 1:30 p.m., defendant Cinotti, the nurse on duty in the hospital's labor room, began the intravenous infusion of Pitocin at the rate of two milliunits per minute. At about 1:45 p.m., Cinotti, at Portadin's direction, increased the Pitocin rate to four milliunits per minute. At about 2:24 p.m., Cinotti claimed she was relieved by defendant Spoltore as the nurse on duty in the labor room in order to prepare the adjacent delivery room for plaintiff. Spoltore disputed that contention, but in any event admitted that at about 2:24 p.m., the Pitocin rate was increased to six milliunits per minute. The note on the strip to that effect was in Spoltore's handwriting.
At about 2:45 p.m., plaintiff was disconnected from the fetal monitoring belt and, at about 2:55 p.m., was transferred to the delivery room. At 3:02 p.m., plaintiff vaginally delivered Diana. At birth, Diana had virtually no heartbeat and, following resuscitation, was diagnosed with cerebral palsy.
Plaintiffs' medical malpractice theory was based on the fact that, after about 2:00 p.m., the fetal heartbeat portion of the paper monitoring strip developed intermittent gaps and became almost illegible. Apparently, the external fetal monitor lost contact with the fetal heartbeat as plaintiff thrashed around during her increased uterine contractions. Plaintiffs alleged that, under accepted medical standards, this loss of continuous fetal heartbeat information required the administration of Pitocin to be immediately discontinued, which would quickly return plaintiff's uterine contractions to their pre-Pitocin pattern. Thereafter, an internal fetal monitor should have been attached directly to the baby's scalp, after which administration of Pitocin could have been safely resumed.
Plaintiffs asserted that Portadin, Cinotti, and Spoltore deviated from these accepted standards because, while administering the Pitocin, they either negligently failed to continuously monitor the fetal heartbeat, as required, or they observed the virtually illegible fetal heartbeat readings on the monitor strip and negligently failed to turn off the Pitocin. Plaintiffs' medical experts opined that Diana's cerebral palsy was proximately caused by oxygen deprivation commencing at about 2:30 p.m., and that Diana would have incurred no brain damage if the Pitocin had been discontinued before that time.
In answer to special interrogatories, the jury found that Portadin did not "deviate from accepted standards of medical practice," and that Cinotti and Spoltore did not "deviate from accepted standards of nursing practice." On appeal, plaintiffs contend that the trial judge committed various legal errors in the jury selection process, in several evidentiary rulings, and in the jury charge. We find no error warranting reversal and affirm.

I.
Plaintiffs contend that the judge "erred by failing to perceive the pattern of systematic exclusion of prospective jurors on the basis of race and/or ethnicity, and in refusing to declare a mistrial." Specifically, plaintiffs complain about "defendants' use of peremptory challenges to eliminate minority members from the venire" *1045 and assert that, as a result, plaintiffs' action was tried before a jury "that had been totally stripped of all Hispanics and partially stripped of other minorities by the improper use of peremptory challenges."[2] Plaintiffs specifically contend that the trial judge erred by failing to follow the procedures established in State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986), and Russell v. Rutgers Comm. Health Plan, Inc., 280 N.J.Super. 445, 655 A.2d 948 (App.Div.), certif. denied, 142 N.J. 452, 663 A.2d 1359 (1995).
During the fourth round of challenges, Cinotti's counsel, Kruttschnitt, used his second peremptory challenge to excuse Hilda Diaz, a Hispanic. During the fifth round of challenges, Kruttschnitt used his third peremptory challenge to excuse John Dukes, a black man. During the seventh round of peremptory challenges, Kruttschnitt used his fourth challenge to excuse Verna Douglas, a black woman. By this time defendants had exercised a total of fourteen out of eighteen permissible peremptory challenges.
After this challenge, plaintiffs' counsel objected and at side bar asked the judge to require Kruttschnitt to give a reason for the exclusion of juror Douglas, in light of the "exclusion of other minorities ... particularly Ms. Diaz, who was the only Hispanic person that we've seen all morning." During the colloquy that followed, it became clear that counsel for Spoltore and Portadin would have excused Diaz, even if Cinotti's counsel had not, because she and plaintiff worked for the same employer.
During the eighth round of challenges, Spoltore's counsel, Crammer, used his sixth (and last) peremptory challenge to excuse Rosa Lopez. After this challenge, plaintiffs' counsel objected and at side bar requested a mistrial:
We now have a pattern of improper excusal of minority jurors. My clients' last name is Velazquez, it's not hard to figure out what's going on here. Ms. Diaz and Ms. Lopez, the only two women, Hispanics, have now been excused. And I think this [c]ourt is bound to make a determination that we are under-represented by minorities. There is no Hispanic member in the jury panel right now, and I would ask for a mistrial.
Following this, the judge asked Crammer to state his reason for excusing Ms. Lopez. Crammer replied that he had excused Lopez because "she has specific medical training," and "I don't want people who have that kind of training to the extent of which I am unaware to then carry over notions [about what] the medical standard of care should be to a nurse." Lopez had stated that she had received training as "a medical assistant."
The judge accepted counsel's reason. In response to plaintiffs' request that he find a "pattern" of excusing minority jurors, the judge said:
Let me make clear what my position on it is. I don't think there needs to be a pattern established in the sense there needs to be a finding that there's a pattern that would ... lay a cloud over the whole proceeding. I just think that once there's beenand I think the Russell case stands for the proposition that once there's sufficient showing that appears as though someone has excused minority [jurors], whether it be Spanish or other, that perhaps counsel ought to be directed to place their positions on the record, which is what Mr. Crammer did. He would appear to have [ ] articulable reasons.
During the ninth round of challenges, Portadin's counsel, Leyhane, used his sixth (and last) peremptory challenge to excuse Ari Johnson, a black woman. When asked for his reason, Leyhane explained: [A]s to that particular juror, my concern was this is a long case, and I think my own idea is, frankly, thatin any event, this is a juror who obviously has a good deal of stuff on her mind, I come last in this case. The anxieties that that kind *1046 of juror, whether white, black, Hispanic or otherwise, might feel as she goes into these, I guess it's [her union] negotiations, later in this case, not being able to participate fully here because of thinking about that, are of concern to me.
The judge accepted his explanation. The record reveals that on the first day of jury selection Ms. Johnson informed the court that she was going to be involved as a union representative in certain labor negotiations and was concerned about the possible conflict with her duties as a juror.
At the end of jury selection plaintiffs concede that two black jurors sat on the jury.[3] Plaintiffs again moved for a mistrial at that time. The judge rejected plaintiffs' request:
But the point of it is that I didn't discern there to be a pattern of either racial or ethnic exclusion. But when that issue was raised, I thought it incumbent upon the [c]ourt to ask counsel to articulate a reason. So, that anyone[an][a]ppellate [c]ourt reviewing this matter could hear what those reasons were and could make a judgment on it. I discerned no pattern in the sense of excusing minorities, including women.
In Gilmore, the Court held, on state constitutional grounds, that peremptory challenges on the ground of presumed group bias, as distinguished from situation-specific bias, unreasonably restrict the possibility that a petit jury will contain a representative cross-section of the community and, as such, impinges on a defendant's constitutional right to trial by an impartial jury. 103 N.J. at 528-29, 511 A.2d 1150. Gilmore, a criminal case, held that there is a rebuttable presumption that the prosecutor has exercised peremptory challenges on permissible grounds. Id. at 535, 511 A.2d 1150. A defendant has the burden of rebutting that presumption by making a prima facie showing that the potential jurors who were wholly or disproportionately excluded were members of a cognizable group, and that there is a substantial likelihood the peremptory challenges were based on assumptions of group bias rather than any indication of situation-specific bias. Id. at 535-36, 511 A.2d 1150. In deciding whether a party has met this prima facie showing, the trial judge should consider all relevant circumstances, including the number of members of the group that were excused, whether the opposing party used a disproportionate number of peremptory challenges against the minority group, whether the excused jurors were, except for their race, otherwise heterogeneous, and whether the excluded jurors were of the same race as the complaining party. Id. at 536, 511 A.2d 1150.
When a defendant makes such a showing, the burden then shifts to the prosecutor to come forward with evidence that the action was justifiable on the basis of a situation-specific bias. Id. at 537, 511 A.2d 1150. The judge must then decide whether the explanations are genuine and reasonable or sham excuses and belatedly contrived. Id. at 537-38, 511 A.2d 1150. In making this decision, the judge must be mindful that the prosecutor's justifications need not rise to the level of a challenge for cause, nor is the prosecutor prohibited from making challenges based on hunches, so long as the exercise of those hunches does not demonstrate, on balance, action premised on group bias. Id. at 538-39, 511 A.2d 1150; State v. Watkins, 114 N.J. 259, 267, 553 A.2d 1344 (1989). The "ultimate" burden of proving that the prosecution has exercised challenges on constitutionally *1047 impermissible grounds remains with the defendant and by a preponderance of the evidence. Gilmore, supra, 103 N.J. at 539, 511 A.2d 1150.
In Russell, we applied the Gilmore principles to civil cases but added the caveat that plaintiff need not make a prima facie showing that counsel has exercised peremptory challenges on constitutionally-impermissible grounds in the Gilmore context where the minority juror who is challenged represents the only minority member of the venire. 280 N.J.Super. at 454, 655 A.2d 948. Further, we reiterated that a reviewing court must give deference to the trial judge's finding that the explanations for the challenges were not pretextual, rather than relying solely on the "cold transcript," because the trial judge is "in the best position to assess the subtle nuances not conveyed by the record, and to gauge the reactions of the attorneys." Id. at 455, 655 A.2d 948.
When plaintiffs first objected to Kruttschnitt's exercise of peremptory challenges, the Russell situation was not present. That is to say, there were other minority jurors in the venire. Accordingly, it was plaintiffs' obligation to establish a prima facie showing that Kruttschnitt had exercised his challenges on a disproportionate basis to exclude members of a cognizable group. Plaintiffs did establish that three out of the five challenges exercised by Kruttschnitt to that point were directed at minorities (two blacks and one Hispanic), arguably a disproportionate number. However, only one of the three was a member of the same minority group as the complaining party. Plaintiffs failed to show that the three excluded minorities were otherwise heterogeneous when compared to the remaining members of the panel. Indeed, the record indicates that they were not. Mr. Dukes' mother was mentally impaired and confined to an institution that specializes in the care of such persons, while Ms. Douglas was an employee of such an institution. Ms. Diaz, on the other hand, was employed by the same employer as plaintiff.
The trial judge's finding that plaintiffs had not established a "pattern" of impermissible challenges was essentially a determination that plaintiffs had not established the necessary prima facie showing under "all of the relevant circumstances" as required by Gilmore, supra, 103 N.J. at 536, 511 A.2d 1150. We find no abuse of discretion in that respect.
The next objection came when Crammer exercised his last peremptory challenge to excuse Ms. Lopez. At that point, there were apparently no other Hispanics remaining on the venire. The challenge to the only remaining Hispanic implicated the holding in Russell, thereby relieving plaintiffs of establishing a prima facie case as to Crammer's challenge. Accordingly, the trial judge appropriately required Crammer to state his reason for excusing the juror. He did so, as noted earlier, articulating a trial-specific reason. Plaintiffs had the burden at that point to prove a "substantial likelihood" that Crammer exercised his peremptory challenge because of group bias rather than situation-specific bias. Watkins, supra, 114 N.J. at 266, 553 A.2d 1344 (quoting Gilmore, supra, 103 N.J. at 536, 511 A.2d 1150). The judge accepted Crammer's reason as non-pretextual, and plaintiffs have advanced no compelling basis to find an abuse of discretion.
Finally, Leyhane exercised his last challenge to excuse Ms. Johnson, a black woman. This was his first use of a peremptory challenge to excuse a minority. Apparently, two black jurors remained on the panel. There was certainly no showing that Leyhane's exercise of peremptory challenges was disproportionate, nor was there a showing that Ms. Johnson was heterogeneous in comparison to the remaining jurors on the panel. Indeed, Leyhane's explanation, though perhaps not technically required, revealed a situation-specific reason for excusing the juror. Again, we find no basis for interfering with the judge's apparent conclusion that plaintiffs failed to carry their burden of proving *1048 that there was a substantial likelihood that the challenge was based on group bias.
We are not oblivious to the possibility that in a civil case involving multiple defense counsel a possibility of collusion among counsel exists, either tacitly or by agreement, to circumvent the principles of Russell. Plaintiffs' argument suggests a tacit undertaking, although Leyhane and Crammer used only two out of their twelve challenges, to excuse minority jurors. All tolled, defense counsel used five out of a possible eighteen challenges to excuse minority jurors, and two minority jurors remained on the empaneled jury. (Kruttschnitt did not use his last challenge). Suffice it to say that whether the record is viewed singularly as to each defendant, or considered as a whole, we find no reversible error. Plaintiffs have failed to carry their burden of proof by a preponderance of the evidence, considering all the relevant circumstances, that there was a substantial likelihood that defense counsel exercised those five challenges for reasons related to group bias.

II.
Noting that R. 1:8-3(c) provides that in civil actions each party is entitled to six peremptory challenges, plaintiffs contend that the judge abused his discretion "in failing to increase the number of plaintiff's peremptory challenges, and in forcing plaintiff to pick a jury with one-third the number of challenges the defense had among them." Specifically, plaintiffs assert that the judge erred in denying their request for more than six peremptory challenges because he "concluded that there was no identity of interest among the defendants."
R. 1:8-3(c) provides:
In civil actions each party shall be entitled to 6 peremptory challenges. Parties represented by the same attorney shall be deemed 1 party for the purposes of this rule. Where, however, multiple parties having a substantial identity of interest in one or more issues are represented by different attorneys, the trial court in its discretion may, on application of counsel prior to the selection of the jury, accord the adverse party such additional number of peremptory challenges as it deems appropriate in order to avoid unfairness to the adverse party.
The judge denied plaintiffs' application, stating:
The number of challenges are the number of challenges provided for in the Rule. And there's authority for altering the number of challenges when there would be a substantial identity of interest in one or more issues. Now, certainly the defense has an identity of issues in the sense that they hope that this case produces a no cause. But that's about as far as the identity of interest goes because they have individual clients with individual theories presented against them.
And even their argument could go so far as to suggest that perhaps they would be pitted against one another as the trial unfolds. Whether that happens or not, but certainly the potential for it is there. And there is not a substantial identity of interest, at least I didn't think there was, or there is, that would cause the[] need to [have] challenges above six.
We find no abuse of discretion in the trial judge's ruling.
In the context of plaintiffs' theory of liability, a critical fact issue concerned which defendant, or defendants, was or were present when the fetal monitor strips became unreadable, and more specifically at 2:30 p.m. when plaintiffs' experts claimed intervention was critical to save the baby from oxygen deprivation. Nurse Cinotti testified at trial that she left the labor room at 2:20 p.m., leaving Nurse Spoltore in charge of the patient and, thus, theoretically responsible for the failure to either alert Dr. Portadin of the alleged problem or disconnect the Pitocin herself. Spoltore, on the other hand, maintained that she was the nurse for the baby, not *1049 the mother, and was present briefly to note that the Pitocin had been increased. She testified that had she increased the Pitocin, she would have noted it both on the strip and on the chart. Thus, during the critical time period, Cinotti had an interest in having the jury believe that she was not responsible for the mother. Spoltore, on the other hand, disclaimed responsibility and by inference pointed blame at Cinotti or Dr. Portadin, if Dr. Portadin was in the room at the time the Pitocin was increased, as he believed he was. The defendant nurses were united only in that they attempted to show the jury that Dr. Portadin was present at the critical time period and had assumed the responsibility of monitoring the mother and baby.
As for Dr. Portadin, the fact that he testified that he was more likely than not present at the time the Pitocin was increased and for some time thereafter, if not the entire time, does not reflect an identity of interest with the nurses. Plaintiffs' nursing expert testified that whatever nurse was responsible for the mother during the time period after 2:30 p.m., she was required to shut off the Pitocin, even if Dr. Portadin was present. Thus, whether Dr. Portadin was present or not during the critical time period, the nursing malpractice theory stood on its own. Likewise, the theory of liability against Dr. Portadin, testified to by another of plaintiffs' experts, was independent of that of the nurses. Accordingly, it simply did not matter to Dr. Portadin whether one, both, or none of the nurses were present during the critical time.
Further, we find no clear evidence in the record that the defense attorneys strategically used "passes" in the course of jury selection in order to have plaintiffs consume all of their six challenges while hoarding theirs. Plaintiffs had two challenges remaining after Crammer exhausted all of his challenges and one challenge after Leyhane exhausted his challenges. Kruttschnitt, who had one remaining challenge after plaintiffs used all of their challenges, did not exercise his last challenge.
We cannot say that the trial judge abused his discretion under the circumstances of this case.

III.
Plaintiffs contend that the judge's "voir dire was inadequate and deprived counsel of meaningful information about any of the prospective jurors." Plaintiffs primarily complain because the judge refused to use their twenty-nine question juror questionnaire, either by having all potential jurors answer it in writing or by the judge using it to question the jurors aloud. We disagree.
In material part, R. 1:8-3(a) provides as follows:
For the purpose of determining whether a challenge should be interposed, the court shall interrogate the prospective jurors in the box after the required number are drawn without placing them under oath. The parties or their attorneys may supplement the court's interrogation in its discretion.
The appellate review standards on this issue are well established. Jury voir dire standards and procedures are traditionally within the broad discretionary powers vested in the trial judge, and the judge's exercise of that discretion will ordinarily not be disturbed on appeal. State v. Williams, 113 N.J. 393, 410, 550 A.2d 1172 (1988). Because "no voir dire is perfect," it need only be "sufficient to secure an impartial jury." State v. Loftin, 146 N.J. 295, 340, 680 A.2d 677 (1996).
While a "voir dire designed to expose potential bias is essential to ensure an impartial jury," an appellate court "should defer to the trial court's decisions about the voir dire." State v. Hunt, 115 N.J. 330, 348, 558 A.2d 1259 (1989). Because one of the primary purposes of R. 1:8-3(a) "is to avoid unnecessarily protracted jury examination[,]" a voir dire need only be "sufficiently thorough to assure the selection of an impartial jury." State v. Murray, 240 N.J.Super. 378, 392 *1050 93, 573 A.2d 488 (App.Div.), certif. denied, 122 N.J. 334, 585 A.2d 350 (1990). Thus, even if the trial judge's voir dire interrogation is "more general and less searching than that requested by counsel," it will not be disturbed on appeal if the appellate court's "review of the record reveals that the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury." State v. Biegenwald, 106 N.J. 13, 29, 524 A.2d 130 (1987).
The judge here believed that his questioning of the potential jurors had been sufficiently thorough to "end up with a jury that is free from at least any taint that's obvious." While the judge's questions did not cover all questions in plaintiffs' questionnaire, they covered many of the most relevant ones. Plaintiffs' allegation that the judge conducted a "perfunctory voir dire" and "inadequate questioning" of jurors is not factually supported by the record.

IV.
Referring to Dr. Dollinger, Dr. Portadin's medical expert, plaintiffs contend that the trial judge erred in permitting Dr. Dollinger to testify beyond the contents of his report on issues never previously discussed by him. The issue is best understood in the context of plaintiffs' theory of liability as to Dr. Portadin.
Dr. Edelberg, plaintiffs' obstetrical medical expert, testified that both the defendant nurses and Dr. Portadin failed to recognize the hyperstimulation of the uterus, an event caused by the administration of Pitocin, and failed to stop the administration of Pitocin to correct the condition. Because of the hyperstimulation, Dr. Edelberg was of the opinion that the fetus suffered from oxygen deprivation, resulting in brain damage to the infant plaintiff. Pitocin is a drug designed to augment uterine contractions. It is a "very, very potent drug, and a very useful drug ... it makes the contraction stronger, and ... it can make the contractions more frequent." The way to tell whether the Pitocin is overstimulating the uterus is to observe the fetal monitor strip and look for contractions that occur more frequently than every "two to three" minutes. And one way to determine whether there is fetal distress is to look for "late decelerations" in the fetal heart rate.
Plaintiffs complain in their brief that Dr. Dollinger, on direct examination, was allowed to give an opinion that plaintiff's uterus was not hyperstimulated by the Pitocin even though his report "never mentioned the issue of Pitocin, or hyperstimulation of the uterus." Plaintiffs contend that their attorney relied upon the absence of such a discussion in Dr. Dollinger's report "in deciding how to present the plaintiff's case, and what issues to emphasize." Plaintiffs, however, never explain how the case would have other wise been presented had they known that Dr. Dollinger would have been permitted to testify as he did.
In any event, Dr. Dollinger's report reflects that he was aware that Pitocin was administered. It further reflects that he examined the fetal monitor strip and concluded that "[m]uch of the late monitor strips are illegible." He also opined that "[w]hile there were some decelerations, they were always followed by excellent accelerations and good beat to beat variability." In essence, he concluded that the inability to accurately trace the fetal heart rate near the end of delivery had no connection to the infant's condition at delivery.
The decision whether to exclude expert testimony at trial on the ground that it goes beyond the perimeters of the expert's report is in the nature of a discovery sanction. As such, it is a discretionary decision and "must be just and reasonable." Mauro v. Owens-Corning Fiberglas Corp., 225 N.J.Super. 196, 206, 542 A.2d 16 (App.Div.1988), aff'd sub nom. Mauro v. Raymark Indus., Inc., 116 N.J. 126, 561 A.2d 257 (1989). Thus, we review the trial judge's determination of this issue in the context of whether there was an abuse of discretion.
*1051 The hallmark for excluding expert testimony in this context is the presence of surprise and prejudice to the objecting party. Westphal v. Guarino, 163 N.J.Super. 139, 146, 394 A.2d 377 (App.Div.), aff'd o.b., 78 N.J. 308, 394 A.2d 354 (1978). These concepts are somewhat elusive because they cannot always be objectively determined. A party cannot claim surprise, however, when the testimony of the expert contains "the logical predicates for and conclusions from statements made in the report[.]" McCalla v. Harnischfeger Corp., 215 N.J.Super. 160, 171, 521 A.2d 851 (App.Div.), certif. denied, 108 N.J. 219, 528 A.2d 36, 37 (1987). Limiting a defense expert to a statement of bare conclusion without giving the expert a chance to explain his or her reasons in detail is not fair or reasonable. In McCalla, we held that "[t]he trial judge's limitation on [the defense expert's] testimony to a mere rebuttal, without foundation, of plaintiff's expert's report was substantially worthless and lacked credibility and conviction; it required `factual underpinning.'" Id. at 172, 521 A.2d 851; see also Congiusti v. Ingersoll-Rand Co., 306 N.J.Super. 126, 131-32, 703 A.2d 340 (App.Div.1997); Hall v. Zuckerman, 202 N.J.Super. 455, 458-59, 495 A.2d 442 (App.Div.1985).
As in McCalla, Congiusti, and Hall, we believe Dr. Dollinger's report provided notice to the plaintiffs that he recognized Pitocin had been administered, and that he had reviewed the fetal monitoring strip to determine the signs of fetal distress, either related or unrelated to the use of Pitocin. If plaintiffs' attorney believed that Dr. Dollinger's report was a "net opinion" without sufficient supporting reasons, his deposition should have been used to further explore the foundation for it. McCalla, supra, 215 N.J.Super. at 172, 521 A.2d 851. We have not been given Dr. Dollinger's deposition testimony for review, but we find nothing in plaintiffs' brief suggesting the reasons for Dr. Dollinger's finding of no deviation were explored in the context of plaintiffs' theory of liability, or that the doctor either dodged questions or gave different answers during his deposition from those he gave at trial.
Although the outcome in Mauro was different from the outcome in all three of the foregoing cases, Mauro does not disagree with the principles of McCalla. Mauro simply comes to a different conclusion on the issue of surprise and prejudice to the objecting party and holds that the trial judge did not abuse his discretion in barring
the testimony. The factual distinction is that there was nothing in plaintiff's expert's report in that case that fairly alerted defendants to the fact that the expert would rely upon specific statistical and epidemiological studies at the time of trial to support his opinion that plaintiff had an enhanced risk of contracting cancer due to his asbestos exposure. In contrast, in this case Dr. Edelberg and Dr. Dollinger were essentially reviewing the same document, i.e., the fetal monitor strip, for the same clues of fetal distress, i.e., lack of variability and presence of late decelerations. The use of Pitocin as a possible contributing factor to such signs of fetal distress was fairly implied. Thus, we cannot conclude that the trial judge abused his discretion in concluding that plaintiffs were neither surprised nor prejudiced by Dr. Dollinger's testimony on this point.

V. Plaintiffs contend that the trial judge erred in allowing Dr. Portadin to testify concerning his general practice, "as though his habit and routine were somehow applicable to the specifics of this labor and interpretation of this monitoring strip, and to explain his alleged thought processes and decision making process in this very case, despite his admitted complete lack of recollection concerning them." Indeed, on direct examination, Dr. Portadin stated that he had no independent recollection of the events of the day in question but could "review the records" and give his "general practice" based upon what he read.
There are two issues relevant to plaintiffs' contention. The first is whether a *1052 witness can testify as to habit or customary practice in response to certain facts in order to prove conformance with that habit or custom on a particular occasion. The other is whether a defendant doctor in a medical malpractice case can offer opinion testimony in support of his defense that he did not breach a standard of care in the treatment of the plaintiff.
As to the first issue, the answer is provided by N.J.R.E. 406(a) and cases interpreting the rule. The rule provides:
Evidence, whether corroborated or not, of habit or routine practice is admissible to prove that on a specific occasion a person ... acted in conformity with the habit or routine practice. In Reaves v. Mandell, 209 N.J.Super. 465, 507 A.2d 807 (Law Div.1986), the defendant doctor could not recall the specifics of any conversation with plaintiff concerning the issue of informed consent, which was the focal issue of the case. Nonetheless, the court held that the doctor could testify as to information he invariably gave to patients with medical problems similar to the plaintiff's as evidence that he gave the same information to plaintiff when he obtained her consent to the operation. Id. at 472, 507 A.2d 807. Other jurisdictions have arrived at the same result in similar settings. See Bloskas v. Murray, 646 P.2d 907 (Colo.1982); Stephen W. Brown Radiology Assocs. v. Gowers, 157 Ga.App. 770, 278 S.E.2d 653 (1981) (holding that doctor could testify as to his own habit or custom but others could not); Palinkas v. Bennett, 416 Mass. 273, 620 N.E.2d 775 (1993); McCormack v. Lindberg, 352 N.W.2d 30 (Minn.Ct.App.1984), review granted, 363 N.W.2d 307 (Minn.), order granting review vacated, 373 N.W.2d 604 (Minn.1985); Rigie v. Goldman, 148 A.D.2d 23, 543 N.Y.S.2d 983 (N.Y.App. Div.1989).
Secondly, to the extent that Dr. Portadin was permitted to interpret the "fetal monitoring strips" or state "reasons why he took certain actions," and to the extent that such testimony constitutes "opinion" testimony, we also find no error. It is well established in this state that a defendant doctor in a medical malpractice case can give opinion evidence in describing his care and treatment of the plaintiff, including any opinion the doctor may have concerning his adherence to accepted standards of care. Carey v. Lovett, 132 N.J. 44, 64-65, 622 A.2d 1279 (1993); see also Stigliano v. Connaught Lab., Inc., 140 N.J. 305, 312-16, 658 A.2d 715 (1995); Ginsberg v. St. Michael's Hosp., 292 N.J.Super. 21, 32-33, 678 A.2d 271 (App. Div.1996) (holding that a treating physician need not be listed as an expert witness). Dr. Portadin's testimony did not violate these basic principles.

VI.
Plaintiffs contend that the trial judge erred in refusing to admit certain hospital protocols into evidence. The protocols in question contained various nursing policies relating to the use of Pitocin, internal fetal monitors, and electronic monitoring in general.
The trial judge ruled that plaintiffs could use the hospital protocols to "buttress ... the standard of care as testified to by the [plaintiffs'] experts," if the standard of care was "in conformance with the protocol or manual." The judge said, however, that if the protocols set forth "a higher standard" than that testified to by plaintiffs' experts, the "protocols and manuals ... would not be admitted." This ruling is in complete accord with Morlino v. Medical Ctr. of Ocean County, 295 N.J.Super. 113, 684 A.2d 944 (App.Div.1996), aff'd as modified 152 N.J. 563, 706 A.2d 721 (1998), and Johnson v. Mountainside Hosp., 239 N.J.Super. 312, 571 A.2d 318 (App.Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990). Indeed, plaintiffs' experts did testify concerning applicable standards of care and related those standards to portions of each of the protocols previously identified.
When it came time for plaintiffs to offer the protocols into evidence, the judge observed that each of the protocols contained *1053 statements of policy that had not been mentioned in the experts' testimony and, thus, should not be considered by the jury. He indicated that the protocols could be entered into evidence if appropriately redacted. After considering the judge's suggestion, plaintiffs' attorney announced that she did not "see how that can be done with these policies." The judge declined to admit the protocols into evidence reasoning that to enter the unredacted protocols "would inject about 15 or 20 new standards in this case that have not been addressed in the testimony and would simply be unfair." The judge held, however, that "comment on them would be appropriate" during summation. We agree with the trial judge that not all of the policy statements made in each of the protocols were accepted by plaintiffs' experts as relevant to the issues at hand or reflective of the standard of care applicable to plaintiffs' case.
Although the judge did not specifically reference the applicable evidence rule, he was essentially holding that the admission of the unredacted protocols would result in the "confusion of issues, or misleading the jury." N.J.R.E. 403. A trial judge's discretion under this rule is "a broad one." State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978). The decision of the trial court must stand unless it can be shown that the court "palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982); Thomas v. Toys "R" Us, Inc., 282 N.J.Super. 569, 582-83, 660 A.2d 1236 (App.Div.), certif. denied, 142 N.J. 574, 667 A.2d 191 (1995).
We find no abuse of discretion in this case. Clearly, only the policies in the protocols that plaintiffs' experts identified as being in accord with the applicable standard of care were admissible. The policies standing alone did not establish a standard of care. See Morlino, supra, 152 N.J. at 581, 706 A.2d 721 (holding that "[a]llowing the admission of PDR warnings without accompanying expert testimony could transform drug manufacturers into judges of acceptable medical care"). Without redaction, the jury would have had difficulty remembering what policies had been established as being in conformance with accepted standards and possibly be mislead into thinking that all of the policies contained in the three protocols were relevant on that issue. Thus, both the "confusion" and "misleading" standards of N.J.R.E. 403(a) were met.

VII.
Plaintiffs also contend that the trial judge erred in his instruction to the jury concerning the hospital protocols. Specifically, plaintiffs state in their brief that "[i]t was error for the [c]ourt here to have limited the jury's use of those policies to standard of care and to have told the jury to disregard them if there was contrary expert testimony." As we have said earlier in this opinion, the protocols were admissible under Morlino only to the extent that they corroborated an applicable standard of care. To the extent that plaintiffs' reading of Morlino expands that concept and suggests that the protocols were also relevant "to show an awareness on the part of each defendant of what they were supposed to be doing"[4] beyond the applicable standard of care, we disagree. First, none of the defendants claimed lack of knowledge of the protocols or their responsibility to follow them. Second, the protocols, like the PDR in Morlino, cannot be used to establish a duty in addition to that which is established by expert testimony. 152 N.J. at 582, 706 A.2d 721.
The judge instructed the jury as follows:
So you, as jurors, are not to speculate or guess about the standards by which the defendants should have conducted themselves in the diagnosis and treatment of Diana, rather you must determine the applicable medical and nursing standards from the testimony of the expert

*1054 witness you heardwitnesses you heard in this case. And I qualified all of those persons as witnessesor as experts....
In this regard, let me just digress a moment, there has been discussion in this case about manuals or protocols or other standards by which the hospital wishes its employees or doctors or nurses to act, and I'm not suggesting to you that those manuals and protocols are unimportant. But this is not a case about those protocols or the manuals. This is a case about a deviation from standard medical or nursing practice. It's not a case about whether every hospital policy was in every instance met. So if you heard about a protocol or a manual which is different than the testimony concerning the standard medical or nursing practice, you should rely on what your memory was as to the standard not what the protocol or manual said, because it is a deviation from the standard which would, if proved by a preponderance or greater weight of the credible evidence, would produce liability. Thank you. When there's a conflict in the testimony of medical experts, and that happens frequently. It's not infrequent that experts will disagree and have an honest disagreement on what the standard is or whether that standard was met. It is for you, the jury, to resolve that conflict using the same guidelines in determining credibility that I mentioned earlier. You are not required to accept arbitrarily the opinions of an expert simply because he or she is an expert. You should consider the expert's qualification, training, experience, as well as her understanding or his understanding of the matters to which he or she testified.
The instruction must be evaluated in the context of the testimony concerning the protocols. The manner in which the case was tried focused the debate concerning what standard of care applied on the expert witnesses' interpretation of the words of the various protocols in the context of the facts of the case. Accordingly, the jury's resolution of what standard of care applied to a given issue necessitated an evaluation of the relevant protocol as well. While the plaintiffs' experts testified that some of the policy statements contained in the protocols were coordinate with their understanding of the applicable standards of care, the defense experts pointed out that the policies identified by plaintiffs' experts were subject to interpretation and, thus, the exercise of judgment in the context of a given patient's circumstances.
By way of example, the protocol concerning the use of internal fetal monitoring stated in part that the procedure "is performed by the physician/CNM [nurse] when the external fetal heart rate tracing is uninterpretable or when the external tracing exhibits a non-reassuring pattern." The dispute among the experts over this policy statement was whether the fetal monitor strip was "uninterpretable," as opposed, for example, to "discontinuous,"[5] and whether the external tracing was "non-reassuring."
Again by way of example, plaintiffs' experts disagreed among themselves as to whether the protocol concerning the use of Pitocin represented the standard of care. The protocol in part stated that Pitocin may be increased "until coordinate contractions are occurring every 3-4 minutes with a duration of 60 seconds[.]" Plaintiffs' nursing expert opined that this represented the appropriate standard. Dr. Edelberg stated, however, that the applicable standard was every "two to three minutes or thereabouts when you're driving the uterus." In contrast, Dr. Dollinger, a defense expert, was in agreement with the policy as to the frequency of contractions but pointed out that frequency is only one factor and must be considered in the context of the duration of *1055 contractions as well. He said that the ideal duration to look for was forty-five seconds, whereas the protocol called for a duration of sixty seconds. Thus, much of the discussion in the course of the trial concerning applicable standards of care was intertwined with interpretations of words and concepts used in the protocols.
When the instruction is read as a whole and in the context of the evidence, the judge properly focused the jury's attention on the important, disputed issuethe applicable medical and nursing standards. Further, contrary to plaintiffs' assertion, the judge did not tell the jurors that the protocols were irrelevant. Rather, he properly instructed the jury to disregard any protocol that was at odds with whatever standard of care the jury decided to apply after evaluating the experts' testimony. The instruction was consistent with the principles stated in Morlino concerning the utilization of documents to corroborate expert witness testimony on the standard of care. 152 N.J. at 578, 706 A.2d 721. We find no error.

VIII.
Without citing any case in support of the argument, plaintiffs claim that the trial judge erred when he permitted defense counsel for Dr. Portadin to use the Physicians' Desk Reference ("PDR") in the cross-examination of Dr. Edelberg. The pertinent testimony is as follows:
Q: Doctor, I asked you a question a moment ago, did you know what the PDR, the Physicians' Desk Reference, lists as the dosage of Pitocin that is equal to the force of a natural, normal labor?
A: I do not know what they list.
Q: Would you be surprised, sir, ifI just put up a couple of things here, 6 mu [six milliunits], have I left something out?
A: That would be reasonable. It depends on the response of the uterus. We talked about [oxytocin] receptors before.
Q: Right.
A: Some women will require four times that dose to keep them in labor. Some people will be hyperstimulated at a half a milliunit. Sobut six is a reasonableor I'll accept that.
Q: Okay. And let's deal with Mrs. Velazquez. What's the highest dose of Pitocin that she ever got?
A: Six milliunits.
Plaintiffs claim that defense counsel misrepresented what the PDR actually said. The PDR excerpt for 1990 on that point actually stated: "Studies of the concentrations of oxytocin in the maternal plasma during Pitocin infusion have shown that infusion rates up to 6 mu/min give the same oxytocin levels that are found in spontaneous labor."
Plaintiffs contend that defense counsel misleadingly used the word "force" rather than the concept of "concentrations" or "levels" as used in the PDR. However, plaintiffs fail to explain in their brief how the interchange of those concepts resulted in prejudice. Dr. Edelberg expressed no confusion in understanding the thrust of counsel's question. Indeed, he agreed with the proposition advanced by defense counsel. The witness could have declined to admit that the PDR was authoritative or asked to see the exact statement but chose not to do so, being satisfied that counsel was expressing a concept that the witness concluded was "reasonable." In any event, Dr. Edelberg hastened to point out that the amount of Pitocin to be administered depends on the response of the individual patient, some women being more sensitive to the medication than others. As we see it, the plaintiffs' point was forcefully made by Dr. Edelbergproper dosage depends on sensitivity of the individual patient and averages are not important. We see no prejudice at all resulting from the questioning.
The judge offered to allow plaintiffs' counsel to read the sentence from the PDR that we have quoted above, but she declined. Instead, counsel asked for permission to read "everything that's relevant" *1056 from the PDR. The judge denied the request. He was correct in doing so. See N.J.R.E. 803(c)(18); Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 608 A.2d 304 (1992). Because plaintiffs were not prejudiced by the cross-examination and because the PDR was not independently admissible, the judge did not err in failing to strike the testimony, refusing the introduction of a copy of the PDR into evidence, or requiring Dr. Portadin's defense counsel to bear the cost of recalling Dr. Edelberg.
Plaintiffs also claim that they were surprised by defense counsel's use of the PDR. They claim that had they known of counsel's intention they could have used other statements in the PDR to buttress their expert's testimony. Undoubtedly that is so. However, plaintiffs do not cite us to an interrogatory, discovery order, court rule, or evidence rule that required such notice.

IX.
Lastly, plaintiffs contend that the judge erred in giving the standard Model Jury Charge because this case was one in Which judgment was not an issue. The instructions given were those that were revised as a result of this court's opinion in Morlino. The Supreme Court generally approved of those instructions with a recommendation that the Supreme Court Committee on Model Jury Charges, Civil, again review the charge to "determine whether fewer than eleven references to judgment adequately will communicate to the jury that medicine is not an exact science and that physicians and surgeons must exercise judgment." 152 N.J. at 590, 706 A.2d 721.
We would have no hesitation in finding error in this case if we believed the jury had a clear-cut choice between applicable standards and once having decided the applicable standard there was no medical or nursing judgment allowed. Patton v. Amblo, 314 N.J.Super. 1, 713 A.2d 1051 (App.Div.1998). We briefly recited some examples of the testimony concerning applicable standards and the judgments that had to be made by both the nurses and defendant doctor in complying with those standards in the discussion of the issue presented in part VII of this opinion. Those examples are, in our view, a fair representation of the nature of the expert testimony concerning other discreet issues on the subject of the defendants' liability. In our view, the exercise of judgment in this case was focal to the jury's determination of fault. Accordingly, we find no error in the instruction.
Affirmed.
NOTES
[1] All subsequent references to "plaintiff" in the singular shall be to Barbara Velazquez, the mother of Diana Velazquez.
[2] Plaintiff is a Polish-American; her husband and Diana are Hispanic-Americans.
[3] As to the two black jurors who were excused by defendant Cinotti, no explanation was required of counsel and none was offered at the time of trial. In her appellate brief, defendant Cinotti directs our attention to the jury voir dire during which Mr. Dukes stated that his mother was mentally impaired and confined to the Vineland Developmental Center, a facility that cares for "retarded citizens." Likewise, Ms. Douglas stated that she was employed by Vineland Developmental Center as a senior food service handler. Defendant Cinotti proffers that the jurors were excused in anticipation of testimony concerning the infant plaintiff's retardation.
[4] These are the words used by plaintiffs' counsel at the charge conference when objecting to the judge's proposed charge on the relevancy of the protocols.
[5] A term used by plaintiffs' nursing expert, which she conceded was not used in the protocol language.