# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3295-10T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MEREDITH N. ROGERS,

    Defendant-Appellant.

_____

> Submitted October 27, 2020 – Decided December 16, 2020
>
> Before Judges Gilson and Moynihan.
>
> On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 09-03-0291.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).
>
> Scott A. Coffina, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

On November 25, 2008, D.C., a seventeen-month-old child, died and medical doctors later testified at trial that his death was caused by blunt force trauma consistent with being violently shaken and struck.[1]  A jury convicted defendant Meredith Rogers of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), as a lesser-included offense of murder, and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).  Defendant was sentenced to forty-seven years in prison with a period of parole ineligibility as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant challenges his convictions, contending that errors during the proceedings deprived him of a fair trial.  He also challenges his sentence, arguing it was excessive.  We reject both these arguments and affirm.

I.

The facts were established at a trial where the State called twelve witnesses, including D.C.'s mother, a friend of defendant, law enforcement personnel, several treating doctors, and two medical experts.  After his motion for acquittal was denied, defendant elected to testify, but he did not call any experts or other witnesses.

---

[1] We use initials for the victim and fictitious names for certain witnesses to protect the privacy interests of the victim's family and the witnesses.

A-3295-10T3

At the time of D.C.'s death, his mother – C.D. (Cathy) – was dating defendant. Defendant would often spend the night at Cathy's apartment where she lived with D.C. and two of her daughters.

On November 24, 2008, Cathy left D.C. in defendant's care while she went to work, and her daughters were at school. When Cathy came home later that day, she saw defendant sitting on the couch with D.C., who had an ice pack on his head. Cathy observed bruises on D.C.'s forehead and face. Defendant told Cathy that D.C. had fallen down the stairs.

Cathy took D.C. to a hospital where Dr. Lisa Liner examined D.C. Dr. Liner testified that she conducted complete physical and neurological examinations of D.C. She observed that D.C. had a hematoma on the right side of his head, some bruising on his face and left ear, but no neurological abnormalities. Dr. Liner also ordered a CAT scan and the result showed no fractures, bleeding, or brain injury. Accordingly, Dr. Liner informed Cathy that D.C. was fine, and she discharged him from the hospital.

After visiting D.C.'s father, Cathy and D.C. returned home. At approximately 8:30 that evening, Cathy put D.C. to bed. Approximately two hours later, at 10:30 p.m., Cathy and defendant went into her bedroom, where they engaged in sexual intercourse. Defendant then went down to the kitchen to

get some food. When he came back to the bedroom, he asked Cathy if D.C. could sleep with them and he brought D.C. into the room. While defendant and D.C. were eating chips and watching television, Cathy fell asleep.

Shortly thereafter, Cathy was awoken by defendant telling her that the baby was not moving. Cathy got up and saw that D.C. was not moving, his skin appeared grayish, his eyes were half open, and his limbs were limp at his side. Cathy placed her hands under D.C.'s back and attempted to shake him and told him to "stop playing." When D.C. remained unresponsive, Cathy asked defendant to call 911.

At approximately 12:40 a.m. on November 25, 2008, several police officers responded to Cathy's home. The officers found D.C. unresponsive; he had no pulse and was not breathing. One of the officers observed an odor of alcohol coming from defendant's mouth and saw alcohol containers on the counter. D.C. was then transported to the hospital by an ambulance.

Dr. Shonola DaSilva testified that she examined D.C. on the morning of November 25, 2008 at the hospital. She observed that D.C. had bruises on his abdomen and face and that he was unable to move parts of his body and could not speak. A CAT scan was conducted, and x-rays were taken of D.C.'s head, chest, and abdomen. Dr. DaSilva observed that D.C. was bleeding internally in

4

different parts of his head. Dr. DaSilva thereafter reviewed the CAT scan taken the prior day and did not observe that same bleeding. Dr. DaSilva opined that D.C. had multiple intracranial bleeds caused by trauma. At approximately 11 a.m. on November 25, 2008, doctors informed Cathy that D.C. was dead.

Thereafter, Dr. Liner was shown pictures of D.C. that were taken from the autopsy. Dr. Liner testified that the picture showed many more bruises than when she examined D.C. the day before his death. Dr. Liner pointed out that there were additional bruises on D.C.'s face, under his chin and cheek, and on his abdomen.

Cathy continued to date defendant for several months after D.C.'s death. She testified that in December 2008, defendant contacted her late one night and asked her to pick him up in Philadelphia. When she went to get defendant, he appeared to have been physically assaulted because he had blood coming down his face and a "busted" lip. After Cathy brought defendant back to her home, he told her he "knows how D.C. feels now." Thereafter, Cathy ended her relationship with defendant.

At trial, the State also called S.F. (Sam), who was a friend of defendant. While incarcerated on an unrelated charge, Sam had requested to speak to a detective to provide information concerning defendant. Sam testified that after

D.C.'s death, he had spoken with defendant on several occasions. According to Sam, defendant stated that he was "stressed out" about the situation and eventually confessed that he was drinking and under the influence of narcotics on the night before D.C.'s death. Defendant then stated that he had grabbed D.C. to stop him from crying, but when D.C. would not stop, defendant "blacked out" and punched and shook the baby. Defendant then told Sam that as D.C. continued to cry, defendant hit him until D.C. became unresponsive.

The State also called two medical experts: Dr. Lucy Rorke-Adams, a neuropathologist, and Dr. Ian Hood, the Burlington County Chief Medical Examiner. Dr. Rorke-Adams examined D.C.'s brain, spinal cord, and eyes. She detailed the numerous injuries she observed to D.C.'s brain, including fractured corpus callosum fibers, various hemorrhages, and evidence of oxygen deprivation. Dr. Rorke-Adams opined that D.C.'s injuries were not consistent with those suffered by a child who fell down steps. Instead, she opined that the injuries D.C. sustained would require angular acceleration, as when a child is shaken, causing the brain to rotate. She also opined that it would have taken a very strong level of force to cause the injuries that she observed in D.C.'s brain.

Dr. Rorke-Adams also found that D.C.'s right eye showed extensive hemorrhaging in front of, behind, and in the retina. She described the injuries

6

as "very characteristic of child abuse," and again explained that those injuries would require violent shaking of the child.

Dr. Hood testified as an expert in forensic pathology. He opined that D.C.'s injuries were not consistent with a child falling down stairs. He observed a knuckle pattern on the infant's face and explained those injuries were caused by blunt force trauma. Dr. Hood went on to opine that the bruises on D.C.'s buttocks were caused by fairly forceful and discrete blunt trauma. He observed that the child had either been hit with a relatively small object or had been thrown against an object that would make those kinds of bruises. Dr. Hood also opined that the child's bruises could have only been caused by trauma. In that regard, Dr. Hood opined that D.C. had been shaken and that the cause of his death was closed head injury and spinal cord trauma. Ultimately, Dr. Hood opined that the child's death was a homicide.

At the close of the State's case, defendant moved for an acquittal. The court denied that motion and defendant elected to testify. Defendant testified that D.C. fell down stairs on November 24, 2008. Defendant went on to testify that as he was going to sleep later that night, he noticed that D.C. was not moving. He stated that he never shook the infant or hurt him in any way.

A-3295-10T3

After hearing the testimony and considering the evidence, a jury convicted defendant of first-degree aggravated manslaughter and second-degree endangering the welfare of a child. At his sentencing, which took place in January 2011, the State argued that the court should sentence defendant as a persistent offender in accordance with N.J.S.A. 2C:44-3. The court determined that defendant would be sentenced to an extended term and that NERA applied to his aggravated manslaughter conviction. Accordingly, the court sentenced defendant on the manslaughter conviction to a term of forty-seven years in prison, with eighty-five percent of that term to be served without parole eligibility. On the endangering the welfare of a child conviction, defendant was sentenced to a concurrent term of ten years in prison with five years of parole ineligibility.

In March 2011, defendant filed a notice of appeal. Later that year, however, the appeal was dismissed for failure to prosecute. After various motions, in June 2019 we granted defendant's motion to vacate the dismissal and reinstate his appeal. Accordingly, defendant now appeals from his convictions and sentence.

## II.

On appeal, defendant makes six arguments, which he articulates as follows:

> POINT I – THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE'S WITNESS TO TESTIFY ABOUT DEFENDANT'S STATEMENT AFTER HE HAD BEEN ASSAULTED IN PENNSYLVANIA.
>
> POINT II – THE TRIAL COURT ERRED BY ALLOWING THE STATE'S EXPERT TO TESTIFY ABOUT THE CAUSE OF D.C.'S INJURIES.
>
> POINT III – THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER COUNT ONE.
>
> POINT IV – THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR AND RELIABLE TRIAL.
>
> POINT V – TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO INVESTIGATE AND CALL A REBUTTAL EXPERT WITNESS THAT D.C.'S FATAL INJURIES COULD HAVE BEEN CAUSED BY FALLING DOWN THE STAIRS AND LANDING ON A GUARD GATE.
>
> POINT VI – DEFENDANT'S [FORTY-SEVEN]-YEAR AGGREGATE SENTENCE WAS MANIFESTLY EXCESSIVE.
>
> (1)    As the State's motion for an extended term was deficient, the imposition of an extended term by the trial was improper.

A-3295-10T3

(2)    As the trial court double counted the application of certain aggravating factors, the matter should be remanded for re-sentencing.

(3)    The trial court erred when it found no mitigating factors applied in this case.

1.    The Testimony About Defendant's Statement

Defendant contends that Cathy should not have been permitted to testify about an incident where defendant had been assaulted in Pennsylvania and his alleged statement that "he knows how [D.C.] feels now."  Defendant argues that neither the incident nor the statement was relevant, and both should have been excluded under N.J.R.E. 403.

Before Cathy provided this testimony, the State alerted defense counsel and counsel objected.  The trial judge overruled defendant's objection, finding that while the statement was subject to different meanings, it was relevant to the disputed issue of whether D.C. had been assaulted.  The court also found that the incident and related statement were not substantially more prejudicial than probative.

"A trial court's ruling on the admissibility of evidence is reviewed on appeal for abuse of discretion."  State v. Rose, 206 N.J. 141, 157 (2011).  "Considerable latitude is afforded" to trial court evidentiary rulings and they

will be reversed "only if [they] constitute[] an abuse of discretion." State v. Cole, 229 N.J. 430, 449 (2017) (quoting State v. Kuropchak, 221 N.J. 368, 385 (2015)).

Under N.J.R.E. 403, a trial court can exclude relevant evidence if its probative value is substantially outweighed by the risk of undue prejudice. State v. Williams, 240 N.J. 225, 237-38 (2019). If the trial court weighs the probative value of the evidence against its prejudicial effect, such a ruling should only be overturned if it constitutes "a clear error of judgment." State v. Koedatich, 112 N.J. 225, 313 (1988).

Here, we discern no abuse of discretion or error. The incident and defendant's statement were relevant to the material issue of whether D.C. was hurt by accidentally falling down stairs or an assault by defendant. While we agree with the trial court that the defendant's statement was subject to varying interpretations, the interpretation and weight were questions for the jury. See Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 502 (App. Div. 2007) (it is within the "province of a jury" to determine the weight of the evidence). In addition, we discern no abuse of discretion in the trial court's finding that the probative value of the incident and defendant's statement were not substantially outweighed by the risk of undue prejudice.

A-3295-10T3

2. Testimony by Dr. Rorke-Adams

Defendant argues that the trial court erred by permitting Dr. Rorke-Adams to testify about the cause of D.C.'s injuries because those opinions were not set forth in her expert report. In her report, Dr. Rorke-Adams listed the observations she made of the damage suffered in D.C.'s brain, spinal cord, and eyes. She did not offer an expert opinion about what could have caused the damage. The trial judge overruled defendant's objection and allowed Dr. Rorke-Adams to testify about the causes of D.C.'s injuries. The trial court found that there was no surprise or prejudice to defendant because defendant had long been on notice that the State contended that he had shaken and punched the child.

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). Expert testimony that deviates from the pretrial expert report may be excluded if the court finds "the presence of surprise and prejudice to the objecting party." Velazquez ex rel. Velazquez v. Portadin, 321 N.J. Super. 558, 576 (App. Div. 1999). If the trial court allows an expert to go beyond her or his report, the court should consider (1) the absence of design to mislead, (2) the absence of the element of surprise if the evidence is admitted, and (3) the absence of prejudice

that would result from the admission of the evidence. Westphal v. Guarino, 163 N.J. Super. 139, 146 (App. Div. 1978).

We discern no abuse of discretion in the trial court's decision to permit the testimony by Dr. Rorke-Adams. There is nothing in the record that indicates a design to mislead. Just as significantly, there was no surprise or prejudice. Defendant was aware of the State's theory of the case that he had caused D.C.'s death by shaking and punching the child. Moreover, Dr. Rorke-Adams' testimony was consistent with the report and testimony by Dr. Hood concerning D.C.'s injuries and death.

3. The Motion for Acquittal

Next, defendant argues that the trial court erred when it denied his motion for acquittal on the charge of first-degree murder. We disagree.

An appellate court reviews the denial of a motion for acquittal de novo, applying the same standard used by the trial judge. State v. Williams, 218 N.J. 576, 593-94 (2014). "We must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Ibid. (citing State v. Reyes, 50 N.J. 454, 558-59 (1967)). The reviewing court "must consider only the existence of such

evidence, not its 'worth, nature, or extent.'" State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

A person is guilty of murder when "(1) the actor purposely causes death or serious bodily injury resulting in death; or (2) the actor knowingly causes death or serious bodily injury resulting in death[.]" N.J.S.A. 2C:11-3(a)(1) and (2). Here, the trial court correctly applied the Reyes standard and found that there was sufficient evidence to allow the jury to consider the charge of murder. The trial court found that the State had presented medical testimony from both Dr. Hood and Dr. Rorke-Adams that D.C. suffered injuries from trauma and shaking. Moreover, the doctors had testified that those injuries caused the child's death. We reject defendant's argument that there was no evidence identifying him as the person who shook D.C. The testimony by Cathy provided strong circumstantial evidence that defendant had purposely and knowingly caused the child's death. Cathy testified that when she went to sleep, D.C. was awake and eating chips. She went on to testify that when she was woken up, D.C. was grayish and limp, and defendant was the only person who had been with D.C.

A-3295-10T3

Cathy's testimony is corroborated by the testimony of defendant's friend Sam. Sam testified that defendant confessed that he shook and punched D.C. until he was unresponsive. While defendant argues that Sam later recanted his statements to a defense investigator, the credibility of Sam's testimony was an issue for the jury.

### 4. The Alleged Cumulative Errors

Having found no individual errors warranting a reversal, we reject defendant's arguments that there were cumulative errors warranting a reversal. Our review of the trial record convinces us that defendant was accorded a fair trial and there were no errors that even when combined warrant a reversal of the jury verdict. See State v. Jenewicz, 193 N.J. 440, 443 (2008); State v. Wakefield, 190 N.J. 397, 538 (2007).

### 5. The Allegations Concerning Ineffective Assistance of Counsel

Defendant asserts that his trial counsel was ineffective in failing to investigate and call a rebuttal witness to testify that D.C.'s fatal injuries could have been caused by falling down the stairs and landing against a guard gate. Generally, an appellate court will not consider ineffective assistance of counsel claims on direct appeal "because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992).

We believe that defendant's arguments concerning the ineffective assistance of his trial counsel are better left for a petition for post-conviction relief (PCR).

We make this ruling recognizing that defendant's direct appeal was delayed for a substantial period. Nevertheless, the current record does not disclose whether trial counsel acted deficiently or whether that failure to act caused prejudice to the defense. Moreover, we note that after defendant's direct appeal was dismissed, but before we allowed it to be reinstated, defendant filed a petition for post-conviction relief which the trial court appropriately denied without prejudice. Accordingly, defendant can address his claims of ineffective assistance of counsel by renewing his PCR petition.

6.    The Sentence

Finally, defendant challenges his sentence. He contends that the State's motion for an extended term was defective, that the sentencing court double-counted certain aggravating factors, and that the court erred when it found that there were no mitigating factors. We are not persuaded by any of these arguments.

When the State seeks to have an eligible defendant sentenced to an extended term, it is required to serve notice on defendant within fourteen days of the return of the verdict. R. 3:21-4(e). When there are multiple convictions,

the State's notice should identify the offense for which the State seeks extension. State v. Thomas, 195 N.J. 431, 436 (2008).

When the State makes an application, the court can sentence a defendant to an extended term as a persistent offender. N.J.S.A. 2C:44-3(a). A persistent offender

> is a person who at the time of the commission of the crime is [twenty-one] years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he was at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.
>
> [Ibid.]

The sentencing court thoroughly reviewed each of the statutory factors and made findings on how defendant met the definition of a persistent offender. The court also accepted the State's clarification that it wanted defendant to be sentenced to an extended term for his aggravated manslaughter conviction. The State had clarified that position in the sentencing memo and defendant has no viable arguments that he was not on notice that the State was seeking an extended sentence on his aggravated manslaughter conviction. Consequently, we discern no abuse of discretion or reversible error in the trial court's decision

17

to grant the State's motion for an extended term and to impose that extended term on the aggravated manslaughter conviction.

We review the remaining sentencing determinations under a deferential standard. State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 549, 606 (2013)). We do not substitute our judgment for "the judgment of the sentencing court." Lawless, 214 N.J. at 606 (first citing State v. Cassady, 198 N.J. 165, 180 (2009); and then citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). Instead, we will affirm a sentence unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Miller, 237 N.J. 15, 28 (2019) (alteration in original) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).]

The trial court found five aggravating factors: one, the nature and circumstances of the offense and the role of the actor, N.J.S.A. 2C:44-1(a)(1); two, the gravity and seriousness of the harm inflicted on the victim, N.J.S.A. 2C:44-1(a)(2); three, the risk defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3); six, defendant's prior criminal record and the seriousness of the

offenses of which he had been convicted, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). All those findings are supported by substantial credible evidence in the record.

Moreover, the sentencing court did not double count aggravating factors one and two. Defendant argues that the application of aggravating factor two effectively double counts the elements for aggravated manslaughter. We disagree. When finding aggravating factor two, the trial court relied on the fact that D.C. was seventeen months old at the time of his death and was unable to protect or defend himself in any way. Since a victim's age and vulnerability are not elements of aggravated manslaughter, no double counting occurred. See N.J.S.A. 2C:11-4(a)(1).

The trial court then considered defendant's arguments concerning mitigating factors but determined that no mitigating factor applied. The court's determination in that regard was also supported by substantial evidence in the record.

Having determined that it would sentence defendant to an extended term as a persistent offender, the forty-seven-year prison term imposed was within the statutorily permissible range for the conviction of first-degree aggravated

19

manslaughter.  Given the nature of the crime, the sentence does not shock our judicial conscious.[2]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] Defendant also contends that there were certain inaccuracies in the judgment of conviction because it states that he waived his right to appeal, the sentence was the product of a negotiated plea, and references a sentencing memo that was not attached.  We do not deem those misstatements sufficient to warrant a remand because defendant was clearly convicted by a jury after a trial and he can obtain the sentencing memo from the trial court.

A-3295-10T3