209 N.J. Super. 465 (1986)
507 A.2d 807
EARNESTINE REAVES, PLAINTIFF,
v.
MICHAEL MANDELL, M.D., DEFENDANT.
Superior Court of New Jersey, Law Division Morris County.
Decided February 4, 1986.
*466 Alice W. Ballard, admitted pro hac vice, for plaintiff (Berman & Levins, attorneys).
Patricia J. Cooney for defendant (Giblin, Combs & Cooney, attorneys).
MacKENZIE, J.S.C.
This is a medical malpractice case. Plaintiff contends that she consented to a total abdominal hysterectomy and left salpingo  oophorectomy on September 7, 1982 without having been fully and properly informed by her obstetrician/gynecologist.[1] Absent emergency, the performance of a surgical procedure by a physician without first obtaining the effective consent of a competent adult, constitutes professional negligence. See Perna v. Pirozzi, 92 N.J. 446 (1983); John F. Kennedy Mem. Hosp. v. Heston, 58 N.J. 576 (1971); Skripek v. Bergamo, 200 N.J. Super. 620 (App.Div. 1985).
On August 10, 1982, plaintiff was presented to defendant Dr. Mandell, a board certified obstetrician/gynecologist, as a 45-year-old, sterile woman with symptoms of heavy and prolonged menstrual bleeding and abdominal pain. She had been referred to defendant by her general physician. Examination disclosed a uterus comparable in size to a 12- to 14-week pregnancy, or 3- *467 to 4-times larger than normal. Pre-operative blood studies revealed anemia, later identified as hypochronic microcytic, due to iron deficiency commensurate with heavy and prolonged bleeding. The uterus was fibroid meaning irregular and filled with multiple myomatous tumors.[2]
Mrs. Reaves testified at trial that she was given no information by Dr. Mandell as to the risks of the operation, nor of any course of treatment except a hysterectomy, nor was she told what would be the likely result of not treating the condition. Dr. Hutchins, testifying for plaintiff, opined that the failure of Dr. Mandell, to advise his patient that a hysterectomy carried with it a risk of sexual dysfunction and premature menopause, and that his failure to advise of possible alternative treatment therapy through hormone therapy, iron supplements and/or a dilation and curettage (D & C), was a deviation from accepted standards of medical practice.
Dr. Mandell conceded that no warning of the kind described by Dr. Hutchins were given, nor was any less intrusive management discussed. He explained that there was no alternative therapy to a hysterectomy for a patient, like plaintiff, presenting with severe and prolonged bleeding from fibroids. There was no need, he contended, to discuss menopausal symptoms, libido loss or depression because those conditions are not known to result when ovarian tissue is left behind. Dr. Morrison, testifying for defendant, refuted the testimony of Dr. Hutchins. He found no deviation from accepted medical practice on the part of Dr. Mandell. He also opined that, given Mrs. Reaves' problems, failure to perform a hysterectomy would have been medical negligence. Dr. Morrison did agree with Dr. Hutchins that a surgeon has a duty to tell his patient about the *468 potential risks of the operation, the alternatives of it and the result, and the probable result of not treating the condition.
A physician who intends to perform a surgical procedure is under an obligation to explain the operation to the patient and to disclose the danger incident to it in order to permit the patient to make an intelligent decision to consent, or not to consent. Informed consent  "is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him [her] to evaluate knowledgeably the options available and the risks attendant upon each before subjecting that patient to a course of treatment." Perna v. Pirozzi, supra, 92 N.J. at 459.
Dr. Mandell could not recall the specifics of any particular conversation with plaintiff. From reference to his office chart, he was sure that he recommended the hysterectomy during Mrs. Reaves' office visit on August 10, 1982. He had no independent or refreshed recollection of what he told her specifically about the risks, dangers, or benefits associated with the proposed surgery. Based on a routine developed over a period of 15 years, he was prepared to testify about the information which he invariably gave to patients who presented a fibroid uterus. The court called for a hearing out of the presence of the jury. Evid.R. 8(1).
Before the court alone, Dr. Mandell stated that he had performed approximately 1000 hysterectomies as of August 10, 1982. Out of that number perhaps 50 women presented a fibroid uterus, 12 to 14 weeks in size, with complaints of heavy and prolonged bleeding as did Mrs. Reaves. In such cases, Dr. Mandell testified his recommendation is always a hysterectomy. Invariably, he asserted, he tells his patient that he has made a diagnosis of a fibroid uterus, what that diagnosis means, why a hysterectomy is needed, the nature of the surgical procedure as *469 well as the risks and complications inherent in the operation, for instance, from anasthesia, excessive bleeding, infection, involvement of other bodily structures and transfusions.[3] He also tells those patients, without exception, there is no viable, medical alternative to a hysterectomy, including the admonition that failing to perform the surgery will result only in more pain, more bleeding, more anemia and eventually even more serious health problems. Lastly, he testified that his fixed practice is always to leave the decision about the operation to his patient, so long as she is an adult and competent. No other evidence was submitted at the Evid.R. 8(1) hearing.
Defendant argued that Dr. Mandell's testimony was admissible under Evid.R. 49.[4] Plaintiff disputed that the criteria of the rule were met and also argued that his testimony was inadmissible as relating to a character trait for care and skill,[5] and not as to habit or custom. No published New Jersey case discusses whether such testimony for a physician is, or is not, admissible for jury consideration. Consideration of the wording and the purposes of the two rules and of the existing case law applying those rules lead the court to rule that the proferred testimony *470 constituted evidence of habit and custom allowed under Evid.R. 49 as tending to prove, if believed, that defendant informed Mrs. Reaves fully and effectively.[6]
Evidence regarding a person's regular and routine practice traditionally has been admissible as probative of whether the person acted in conformity with his habit or custom in respect to the event in question. See Evid.R., comment 1, Evid.R. 49 (Anno. 1986). Habit evidence is offered to allow the jury to infer, if it sees fit, that conduct on a specific occasion conformed to habit. In the context of Evid.R. 49, habit is one's regular response to a repeated specific situation. See McCormick, Evidence, § 195 at 462 (2 ed. 1972).
Even before our Rules of Evidence were adopted, evidence of standard office procedure in mailing letters was admitted as tending to prove that a particular letter was, in fact, mailed. Borgia v. Bd. of Review, 21 N.J. Super. 462 (App.Div. 1952); see also Tolentino v. Oxford Tp., 4 N.J. Tax 173, 180 (Tax Ct. 1982). Later, evidence of a pedestrian's regular manner of crossing a public street has been held to be admissible in a wrongful death action, which arose out of vehicular-pedestrian impact. Burd v. Vercruyssen, 142 N.J. Super. 344 (App.Div. 1976), certif. den. 72 N.J. 459 (1976). Similarly, the regular police practice of having an officer available at all times to administer a breatholyzer test to a suspected drunk driver was admitted to prove that an officer was present when defendant refused to take the test, *471 even though the arresting officer could not remember who the operator was. In Re Arndt, 67 N.J. 432 (1975).
On the other hand, it is improper to permit jurors to infer that an individual was negligent in respect to the event on trial just because in general he is careless. Evid.R. 48; Sutton v. Bell, 79 N.J.L. 507 (E. & A. 1910). Similarly, the general reputation for carelessness of a bus manufacturer was inadmissible in an action against a public carrier for negligent inspection and maintenance of its equipment. Rapp v. Butler Newark Bus Lines, 103 N.J.L. 512 (Sup.Ct. 1927), aff'd o.b. 104 N.J.L. 444 (E. & A. 1928). Evidence of chronic alcoholism, arguably a character trait, is not admissible to prove intoxication on a particular occasion. State v. Franklin, 52 N.J. 386[7] (1968); Shelley v. Brunswick Traction Co., 65 N.J.L. 639 (E. & A. 1901).
The specific line dividing inadmissible character evidence from admissible habit evidence is often illusive as expressed in McCormick:
Character and habit are close akin. Character is a generalized description of one's disposition, or one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness. "Habit," in modern usage, both lay and psychological, is more specific. It describes one's regular response to a repeated specific situation. If we speak of character for care, we think of the person's tendency to act prudently in all the varying situations of life, in business, family life, in handling automobiles and in walking across the street. A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or giving the handsignal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic. [McCormick, op. cit., supra at 462-463]
In a similar vein, Professor Slough has commented:
Character evidence is panoramic and faces exclusions because it overemphasizes the importance of disposition and general traits; habit is specific and *472 emphasizes regular practice. Habit `describes one's regular response to a repeated specific situation'. [Slough, Relevancy "Unraveled," 5 Kan.L.Rev. 404 (1957)]
Plaintiff argued that Dr. Mandell's testimony amounted to no more than a characterization that he is careful and skillful in advising his patients fully before seeking their consent to surgery. If so, the testimony would relate only to general predisposition for care and skill in his practice of medicine and would be inadmissible under Evid.R. 48. The court finds, however, that the physician's behavior was so consistent over the years, considering the uniformity of response and the adequacy of the prior instances, when confronted with a similarly presenting patient, to rise to the level of habit. As McCormick instructs, habit is considered probative and therefore superior to character evidence because "the uniformity of one's response to habit is far greater than, the consistency with which one's conduct conforms to character or disposition." McCormick, op. cit., supra. at 463.
Tested by these standards, Dr. Mandell was permitted to present his testimony to the jury which was instructed, in turn, that they were to determine the weight and value of such testimony.[8]
NOTES
[1] Plaintiff conceded that the operation was performed properly and in a medically accepted manner within the standard of care.
[2] Consent, in fact, to the surgery was not an issue. Plaintiff signed a standard form consent to surgery in favor of Dr. Mandell before the operative procedure was performed.
[3] He also testified that his usual practice is to explain the function of the uterus in the birthing process. Because previous surgery had resulted in Mrs. Reaves' inability to bear children, he was uncertain as to whether he followed his usual routine in this respect.
[4] Evid.R. 49 provides as follows:

HABIT OR CUSTOM TO PROVE SPECIFIC CONDUCT
Evidence of habit or custom whether corroborated or not is admissible to prove conduct on a specified occasion in conformity with the habit or custom.
[5] Evid.R. 48 reads:

CHARACTER TRAIT FOR CARE OR SKILL; INADMISSIBLE TO PROVE QUALITY OF CONDUCT
Evidence of a trait of a person's character with respect to care or skill is inadmissible as tending to prove the quality of his conduct on a specified occasion.
[6] Although not made known to the jury, the court found Dr. Mandell's uncorroborated testimony at the hearing to be credible and convincing. The court was also satisfied that defendant had established a foundation of sufficient instances of such conduct to warrant reliability. Evid.R. 50. Compare the "many times" standard expressed in Burd v. Vercruyssen, 142 N.J. Super. 344 (App.Div. 1976), certif. den. 72 N.J. 459 (1976) with the inadequacy of one instance of prior conduct (Bonnet, et al. v. Stewart, 68 N.J. 287 (1975)) or even two prior examples (Matter of Wenderwicz, 195 N.J. Super. 126, 131 (App.Div. 1984)). The number of instances, 50 or so, attested to by Dr. Mandell was numerous enough to base an inference of systematic conduct.
[7] In Franklin, id. 52 N.J. at 400, the Supreme Court instructed that such evidence may, however, go to the issue of the credibility of such a witness when she asserts total recall of all events relevant to the issues at trial.
[8] Evid.R. 49 is comparable to Rule 406 of the Federal Rules of Evidence. Evidence of habit and routine practice has been admitted under this rule at malpractice trials. See Meyer v. United States, 464 F. Supp. 317 (D.Colo. 1979), aff'd 638 F.2d 155 (10 Cir.1980); In Re Swine Flu Immunization Product, 533 F. Supp. 567 (D.Colo. 1980). Evidence of a physician's habit and custom has been admitted in other states having a similar evidence rule. See Harnish v. Children's Hosp. Med. Center, et al., 387 Mass. 152, 439 N.E.2d 240 (1982); Bloskas v. Murray, 646 P.2d 907 (Colo.Sup.Ct. 1982); In Stephen W. Brown Radiology Assoc. v. Gowers, 157 Ga. App. 770, 278 S.E.2d 653 (1981), the court ruled that a witness may testify as to his fixed and uniform habit in such cases, but not as to the habit and custom of another. See generally Annotation, "Propriety in Medical Malpractice Case, of Admitting Testimony Regarding Physician's Usual Custom or Habit in Order to Establish Nonliability," 10 A.L.R. 4th 1243 (1981).