654 A.2d 1007

RAYMOND DELGAUDIO AND MARTHA DELGAUDIO, HIS WIFE, PLAINTIFFS–APPELLANTS, v. ERNESTO RODRIGUERA, M.D., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 15, 1995—Decided March 13, 1995.

Before Judges PRESSLER, CONLEY and NEWMAN.

E. Drew Britcher argued the cause for appellants (Stern Steiger Croland, attorneys; Mr. Britcher, Mindy Michaels Roth and Armand Leone, Jr., on the brief).

Evelyn C. Farkas argued the cause for respondent (Francis & Berry, attorneys; Ms. Farkas, of counsel; Peter A. Olsen, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiffs appeal a jury verdict resulting in a dismissal of their medical malpractice complaint and based upon a jury finding that they had not demonstrated that defendant deviated from standard medical practice in his treatment of plaintiff, Raymond Delgaudio (hereinafter plaintiff). We conclude that the trial court erred in precluding plaintiff from using, during his examinations of defendant and defendant's experts, certain portions of the Board of

Medical Examiners' 1991 and 1993 administrative decisions in connection with defendant's license suspension and revocation. Because the focus of this impeachment evidence concerns a crucial credibility issue, the error plainly was not harmless and requires reversal.

We emphasize, however, that our ruling is quite narrow in scope. It is limited to very specific portions of the Board's decisions and limited to the use of those portions only as extrinsic evidence of impeachment pursuant to *N.J.R.E.* 607 and 608 and not as substantive evidence. As such, its use requires an accompanying jury instruction as to its limited consideration which, we would think, should be given by the trial judge, at the least, upon its initial use and again in the jury charge at the end of the case. Moreover, because there are only small portions of the Board's decisions that can be used by counsel in examining the witnesses, the Board's decisions, or any other part of the administrative record, which should of course be marked for identification, should not be independently admitted into evidence. Rather, counsel should incorporate the critical portions in appropriate questions. We leave it to trial counsel to formulate such questions, but any reference to the Board's decisions must be limited to what we herein set forth. We hasten, however, to add that our ruling is based upon the record as it has been presented to us and limited to our consideration of plaintiff's examination of defendant and defendant's liability experts. Our ruling should not be read to limit further use of the Board's decisions or the relevant underlying findings in the event defense counsel, through his or her own questions, opens the proverbial door.

With those precautionary comments we commence our analysis. From 1977 to 1989, plaintiff was treated by defendant, a cardiologist. During the course of that treatment, he underwent open heart surgery for coronary artery bypass grafting and thereafter was treated with various cardiac medications. In May 1989, defendant prescribed Procan SR, a known side effect of which is

hemolytic anemia.[1]  One of the indications of such a condition can be blood in the urine.  During a June 9, 1989 appointment with defendant, plaintiff claimed that he told defendant that his urine had darkened to a "rusty-brown" color.

Defendant did not have an independent recollection of the office visit and therefore relied on his medical records for that day in answering questions about what transpired during that examination.  He testified that he would have recorded such a complaint and agreed with the experts that a urinalysis would have been required to ascertain the nature of the problem.  No urinalysis was ever performed.  Relying upon his office record of that date, defendant denied that plaintiff had complained of blood in his urine on June 9, 1989.

In late July 1989, plaintiff was hospitalized.  It was determined that he had developed hemolytic anemia.  Defendant admitted that plaintiff's hospitalization was caused by a side effect of the medication.  The medication was immediately discontinued.  However, the hemolytic anemia was so severe that before plaintiff fully recovered he was hospitalized three more times for a total of 73 days costing over $59,000.

In his malpractice complaint against defendant, plaintiff claimed several deviations from accepted medical practice in connection with defendant's treatment of plaintiff with Procan S.R.  One of the alleged deviations was premised upon plaintiff's claim that he had complained of darkened urine or blood in his urine on the June 9, 1989 visit.  According to plaintiff's expert, the drug should have been discontinued on that date.  To be sure, not only did defendant deny that plaintiff had reported darkened urine on June 9, 1989, but his experts opined that that was impossible because blood studies performed on June 9, 1989 showed normal hemoglobin and bilirubin levels which were inconsistent with hemolytic anemia.  It was however, conceded by Dr. Kramer, one of defen-

[1] Hemolytic anemia is the auto-immune destruction of red cells by the body as a result of sensitization of the immune system by an antigen.

dant's experts, that blood in the urine could occur before a patient becomes anemic because "just a little bit of blood looks like a lot of blood in the urine." Defendant's experts expressly acknowledged, moreover, that they relied upon the accuracy and truthfulness of the June 9, 1989 office record in arriving at their opinions.

Whether or not plaintiff complained of darkened urine on June 9, 1989, then, was plainly a critical part of plaintiff's allegations of deviation. Equally plain, the accuracy and truthfulness of defendant's office record and his say so, was a crucial credibility issue for the jury to resolve. As we have said, there are some portions of the administrative decisions at issue here which bear upon this issue.

Prior to trial, defendant had moved to preclude plaintiff's use of the Board's 1993 suspension and 1991 revocation decisions and the findings and conclusions in connection therewith. As far as we can discern, that application was not ruled upon until after the jury was selected and sworn. At that time, plaintiff made no effort to identify or isolate any portions of the Board's decisions and the administrative record which he wished to use or identify any particular purpose for such use. In essence, he sought admission, substantively, of the entire administrative record.

■ Because the suspension and revocation and supporting record involved a multitude of misconduct, including sexually deviant behavior, we are not surprised at the trial judge's denial of plaintiff's application. Without question, the suspension and revocation and general contents of the administrative record including all of the various and, aside from the record-keeping untruths and inaccuracies, unrelated instances of misconduct, are not admissible here to establish a general character trait of carelessness, lack of skill, *N.J.R.E.* 404(a), or other "wrongs or acts ... to prove the disposition of a person in order to show that he acted in conformity therewith," *N.J.R.E.* 404(b). *See* discussion of interrelationship between former *Evid.R.* 20, 22 and 47 in *State v. Hutchins,* 241 *N.J.Super.* 353, 361–62, 575 *A.*2d 35 (App.Div.1990).

■ Equally clear, and limited to the record-keeping infractions, we do not believe the record is sufficient to demonstrate the record-keeping infractions are defendant's habit and custom. *N.J.R.E.* 406. That is, the record is not sufficient to show a "regular practice of responding to a particular kind of situation with a specific type of conduct [*i.e.* habitually failing to record patient complaints]". *McCormick on Evidence,* § 195 at 825–26 (Strong Ed., 4th ed. 1992). *See State v. Kately,* 270 *N.J.Super.* 356, 362, 637 *A.2d* 214 (App.Div.1994); *State v. Radziwil,* 235 *N.J.Super.* 557, 565–66, 563 *A.2d* 856 (App.Div.1989), *aff'd,* 121 *N.J.* 527, 582 *A.2d* 1003 (1990); *Reaves v. Mandell,* 209 *N.J.Super.* 465, 471, 507 *A.2d* 807 (Law Div.1986). *Compare State v. Franklin,* 52 *N.J.* 386, 399, 245 *A.2d* 356 (1968).

■ But long ago it was observed that "as a general rule, any fact which bears against the credibility of a witness is relevant to the issue being tried, and [a] party … has a right to have that fact laid before the jury in order to aid them in determining what credit should be given to the person testifying. … Were it otherwise, the value of cross-examination in the search for truth which goes on in our courts every day would be severely curtailed and in some respects perhaps extinguished altogether." *State v. Pontery,* 19 *N.J.* 457, 472, 117 *A.2d* 473 (1955). *See State v. Martini,* 131 *N.J.* 176, 255, 619 *A.2d* 1208 (1993); *State v. Silva,* 131 *N.J.* 438, 444, 621 *A.2d* 17 (1993) (extrinsic impeachment evidence may include "defect of character" and "proof by others that material facts are otherwise than as testified to by the witness under attack."). Impeachment of a witness' credibility need not be limited to evidence adduced at trial. *Martini,* 131 *N.J.* at 255, 619 *A.2d* 1208. To be sure, counsel does not have license to "roam at will under the guise of impeaching the witness," *Pontery,* 19 *N.J.* at 473, 117 *A.2d* 473, and the trial judge retains broad discretion to determine the proper limits of examination of a witness' credibility. *State v. Engel,* 249 *N.J.Super.* 336, 375, 592 *A.2d* 572 (App.Div.), *certif. denied,* 130 *N.J.* 393, 614 *A.2d* 616 (1991). *And see State v. Hutchins, supra,* 241 *N.J.Su-*

*per.* at 360–62, 575 *A.*2d 35. But here there are some portions of the administrative record which bear upon defendant's veracity as to his record-keeping claims and thus affects his credibility. We focus entirely upon them. If we have missed any, it is because plaintiff has not been so discerning.

In July 1989, the administrative complaint that led to the Board's 1991 decision was filed against defendant and thereafter amended. It alleged various instances of improper conduct, including misrepresentations in some of his records. In its March 21, 1991 suspension decision and in adopting the Administrative Law Judge's findings concerning the misrepresentations in defendant's reports, the Board found that defendant had engaged in "a deliberate effort affirmatively to mislead" and quoting from the ALJ's initial decision expressed its opinion that it was "distressed by [defendant's] 'sad propensity . . . to play somewhat fast and loose with the truth.' " [2]

Subsequently, in November 1991, the complaint that led to the 1993 decision was filed alleging, among other instances of misconduct, twelve instances of failures to maintain accurate and truthful patient records covering the years 1980 to 1987 and concerning seven patients. The instances of failures to maintain accurate and truthful patient records included failures to record patient histories and results of physical examinations. The ALJ concluded that all of the instances of inaccurate and untruthful records had been amply demonstrated by the State. In its June 2, 1993 decision revoking defendant's license, the Board accepted these conclusions and in doing so accepted the ALJ's opinion that, among other attributes, defendant was "willing to distort the truth" and opined "[e]ven more disturbingly, the record in this matter is replete with examples where [defendant's] records . . .

---

[2] We affirmed the Board's determination on defendant's appeal, *In re Rodriguera,* Docket No. A–3505–90T1, and in doing so specifically noted the Board's finding that some of defendant's statements in patient records represented "a deliberate effort affirmatively to mislead."

are not worthy of trust." [3]   We view these expressions as clear opinions concerning defendant's lack of veracity, and, critical here, directly in connection with his record-keeping.

The portions of the Board's decisions which we have quoted lead us directly to *N.J.R.E.* 607 and 608. *N.J.R.E.* 607 provides in pertinent part that:

Except as otherwise provided by Rules 405 and 608, for the purpose of impairing ... the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility, except that the party calling a witness may not neutralize the witness' testimony by a prior contradictory statement unless the statement is in a form admissible under Rule 803(a)(1) or the judge finds that the party calling the witness was surprised....

Although in denying plaintiff's request to use the evidence the trial judge considered the fact that plaintiff called defendant as his own witness, we do not see that as an impediment to the admission of the limited portions of the Board's decisions that we have referred to.   Only a prior contradictory statement is subject to limitations upon neutralization of one's own witness under *N.J.R.E.* 607.   We are not here dealing with prior contradictory statements of defendant.

The use of extrinsic evidence for impeachment under *N.J.R.E.* 607 is subject to the limitations of *N.J.R.E.* 405 and 608. Those rules relate to the method of proving a character trait.   As to those portions of the Board's decisions which we have identified as useable impeachment evidence, we are dealing with defendant's character for veracity or truthfulness.   It is *N.J.R.E.* 608, then, that governs.   That rule provides in pertinent part:

The credibility of a witness may be attacked ... by evidence in the form of opinion or reputation, provided, however, that evidence relates only to the witness' character for truthfulness or untruthfulness ... [but] a trait of character cannot be proved by specific instances of conduct.

---

[3] We affirmed the Board's determination on defendant's appeal, *In re Rodriguera,* Docket No. A–5737–92T1, and in doing so specifically noted the Board's opinion that defendant's records were "not worthy of trust."

Here, the Board expressly opined that defendant was not truthful and, more to the point, not truthful within the context of his record-keeping. We think that opinion is expressed in the portions of its two decisions which we have isolated. Those portions may be used to impeach defendant, albeit the underlying incidents that form the basis therefor may not be.

Again, we caution that this is not bad conduct, habit or custom, or skill or care evidence and we reject plaintiff's contentions in connection therewith. The underlying instances of misconduct or the fact of a suspension and revocation are likewise not admissible. And because they are not, we see no basis to defendant's claim of prejudice outweighing the probative value of the impeachment evidence. He can not seek solace in *N.J.R.E.* 403. Simply stated, the Board has expressed an opinion that defendant lacks veracity and particularly in the area of his record-keeping. The Board is responsible for overseeing the professional conduct of doctors. Certainly its opinions are expressive of at least one portion of the medical community within which defendant functions. *Cf. State v. Johnson,* 216 *N.J.Super.* 588, 605, 524 *A.*2d 826 (App.Div.1987); *State v. Micci,* 46 *N.J.Super.* 454, 461–62, 134 *A.*2d 805 (App.Div. 1957); *N.J.R.E.* 803(c)(21). We can discern no basis for the exclusion of that highly relevant impeachment opinion evidence. We caution, again, however, that the jury should carefully be instructed as to the limited use of the evidence, *i.e.* that it bears entirely upon their evaluation of defendant's credibility and can not be considered as substantive evidence of what actually occurred on June 9, 1989 and whether in fact plaintiff complained of darkened urine. *See N.J.R.E.* 105; *State v. Cofield,* 127 *N.J.* 328, 341, 605 *A.*2d 230 (1992).

Finally, what we have said as to use of the Board's decision to impeach defendant applies as well to his liability experts. Obviously consistent with *N.J.R.E.* 703, the experts expressly stated that their reliance upon the June 9 office record was premised upon their assumption of its truthfulness, otherwise such reliance would not be reasonable. We see no basis for precluding plaintiff

from probing and impeaching this reliance with the use of those portions of the Board's decisions that we have previously quoted.

Reversed and remanded for a new trial consistent with this opinion.