NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-0090-15T2

ALEXANDRA GRANOVSKY,

 Plaintiff-Appellant/
 Cross-Respondent,

v.

STEPHEN A. CHAGARES, M.D.,

 Defendant-Respondent/
 Cross-Appellant,

and

LOUIS MAZZELLA, M.D. and
MONMOUTH MEDICAL CENTER,

 Defendants.
___________________________

 Argued September 28, 2016 – Decided August 15, 2017

 Before Judges Alvarez, Accurso and Manahan.

 On appeal from Superior Court of New Jersey,
 Law Division, Monmouth County, Docket No. L-
 3717-10.

 Hugh M. Turk argued the cause for
 appellant/cross-respondent (Sullivan,
 Papain, Block, McGrath & Cannavo PC,
 attorneys; Mr. Turk, of counsel and on the
 brief).
 Richard A. Amdur argued the cause for
 respondent/cross-appellant (Amdur, Maggs &
 Shor, PC, attorneys; Mr. Amdur, on the
 brief).

PER CURIAM

 Plaintiff Alexandra Granovsky appeals from the jury's no

cause verdict on her medical malpractice claim against defendant

Stephen A. Chagares, M.D. Defendant cross-appeals from a pre-

trial ruling preventing the surgeon who repaired the injury

inflicted by defendant from offering opinions on the standard of

care. Because we conclude evidentiary error deprived plaintiff

of a fair trial, we reverse. We find no merit to the cross-

appeal.

 Defendant operated on plaintiff, a thirty-four-year-old

pharmacist, to remove her gallbladder by performing a

laparoscopic cholecystectomy. There is no dispute that in the

course of that procedure, defendant, a general surgeon, cut the

wrong duct, resulting in plaintiff's injury. The issue at trial

was whether that was a recognized complication of the surgery,

as defendant argued, or a deviation from the standard of care.

 The gallbladder is a storage facility for bile, which is

produced in the liver to aid in the digestion of fatty foods.

The liver is located in the upper right abdomen. The

gallbladder is underneath it. The liver and the gallbladder

 2 A-0090-15T2
each have ducts, which connect the two organs, and carry the

bile into the small intestine. The liver has two ducts, one

from the left lobe and the other from the right lobe, which

merge to form the common hepatic duct. The duct descending from

the gallbladder is called the cystic duct. The cystic duct from

the gallbladder merges with the common hepatic duct from the

liver to form the common bile duct, which empties bile into the

duodenum, the start of the small intestine.

 To remove the gallbladder, the surgeon frees it from the

liver by clipping and cutting the cystic duct and the cystic

artery, the main blood supply to the gallbladder. It is

undisputed that clipping and cutting the common bile duct is not

part of the procedure and will, if not repaired, result in

serious harm to the patient.

 Defendant testified he put five clips on what he believed

to be the cystic duct, two clips close to the gallbladder and

three lower down and cut between them. After he cut what he

believed to be the cystic duct, he put six clips on what he

believed to be a bifurcated cystic artery, one on each branch

close to the gallbladder and two lower on each branch and cut

both branches between the clips. Although defendant wrote in

his post-operative report that the surgery was performed without

 3 A-0090-15T2
complications, he conceded at trial that he inadvertently

clipped and cut plaintiff's common bile duct causing her injury.

 A few days after the surgery, plaintiff went to an

emergency room in New York complaining of nausea, vomiting and

jaundice. She was transferred to Westchester Medical Center,

where Dr. Manuel Rodriguez-Davalos performed an open surgical

procedure and discovered that plaintiff's common bile duct had

been severed. Dr. Rodriguez-Davalos repaired the problem by

performing a Roux-en-Y hepaticojejunostomy, a procedure to re-

route plaintiff's biliary system by attaching the common hepatic

duct directly to the jejunum, the middle section of the small

intestine.

 At Dr. Rodriguez-Davalos's de bene esse deposition, the

parties stipulated the doctor was testifying as plaintiff's

treating physician and not as an expert on liability. Following

the deposition, plaintiff filed a pre-trial motion to strike

certain non-responsive comments in which the doctor expressed

the opinion that defendant did not deviate from the standard of

care.

 Judge Quinn granted the motion, reasoning that the witness

was not "produced as an expert on liability." The judge

accordingly struck those portions of the testimony in which the

doctor expressed the view that defendant had removed plaintiff's

 4 A-0090-15T2
gallbladder "in an appropriate fashion," that "some

abnormalities . . . sometimes are difficult [for surgeons] to

identify," "that the hepatic duct and the common bile duct are

very close to the cystic duct. . . . So it is not uncommon that

. . . these structures, can be confused or again because of the

small size and the fact that they can run parallel, can be

misidentified," and that cutting the wrong duct was not an

"uncommon" problem and "could happen to any surgeon in the

country." Judge Quinn subsequently denied defendant's motion

for reconsideration.

 Shortly before a scheduled trial date, defendant subpoenaed

Dr. Rodriguez-Davalos for a second deposition. Over plaintiff's

objection, Judge Quinn entered an order which permitted the

deposition to proceed, but prohibited "questions on standard of

care." Defendant was permitted to question the doctor "only on

[the] surgery he did."

 Defendant's counsel did not schedule Dr. Rodriguez-

Davalos's second deposition until just prior to a rescheduled

peremptory trial date. At a pre-trial conference, counsel

advised the judge assigned to try the case of the scheduled

deposition and Judge Quinn's prior rulings regarding its scope.

The trial judge advised counsel he would not disturb Judge

 5 A-0090-15T2
Quinn's prior rulings regarding the deposition or its limited

scope.

 The other pre-trial ruling with significance for the issues

on appeal involved informed consent. Plaintiff did not bring an

informed consent claim. Anticipating defendant would attempt to

introduce his consent form and that he advised plaintiff of the

risk of common bile duct injury, plaintiff made a motion in

limine to exclude all evidence of informed consent at trial.

She contended the absence of an informed consent claim made

evidence of consent both irrelevant and unfairly prejudicial

because of its risk of confusing the jury. Defendant countered

that showing the jury that he informed plaintiff before the

surgery that injury to the common bile duct can occur,

constituted proof that such an injury was a known risk and its

occurrence was not a deviation from the standard of care.

 The trial judge denied plaintiff's motion, finding no New

Jersey case law on point and the cases from other jurisdictions

"not precedent for the conclusion the plaintiff asks me to draw

here." Instead, the judge pronounced himself convinced that

excluding reference to the preoperative discussions "would

certainly result, could certainly result in the same type of

prejudicial inferences that the plaintiff is concerned with[,]

being visited upon the defendant."

 6 A-0090-15T2
 The judge explained:

 [Plaintiff has] the burden of proof. But
 the defendant has a right to defend himself,
 and that would substantially impede his
 ability to do so. . . . You're talking
 about inferences that would lead a jury to
 infer that Dr. Chagares took no steps to
 explain the procedure, or could lead to the
 conclusion that a juror or all the jurors
 could infer that there was a lack of
 explanation of the significance of the
 surgery. And I don't see any way of
 separating the two.

The judge concluded his ruling on the issue by saying that he

was "not going to preclude the defendant from effectively

advancing a defense to the complaint that's been made against

him."

 At trial, plaintiff presented the video of Dr. Rodriguez-

Davalos's first deposition, redacted in accordance with Judge

Quinn's order, to explain the surgeon's discovery of plaintiff's

transected common bile duct and its repair. Plaintiff's

liability expert, Dr. Michael Drew, testified defendant deviated

from the standard of care by failing to obtain a critical view

of both the cystic duct and the cystic artery entering the

gallbladder before clipping and cutting either structure. He

further claimed defendant should have realized his error before

concluding the procedure.

 7 A-0090-15T2
 Based on defendant's post-operative report, Dr. Drew

concluded defendant never obtained that critical view of both

structures entering the gallbladder, but instead clipped and cut

what he thought was the cystic duct before the cystic artery was

visible. Dr. Drew explained that defendant's technique was "the

old way of doing it, what's called the infundibular approach."

He claimed that approach resulted in "more common bile duct

injuries than surgeons had seen in the previous 30 or 40 years

in the first couple of years" of laparoscopic procedures. Dr.

Drew claimed the number of common bile duct injuries occurring

as a result of the infundibular approach resulted in its

abandonment in the mid-1990s when it was replaced by the

critical view method. Defendant operated on plaintiff in 2009.

 Defendant's counsel cross-examined Dr. Drew about his

preoperative discussions with patients and defendant's informed

consent form. Counsel got the doctor to concede there is "a

difference between a complication and medical malpractice" and

that he tells his patients that "a possible complication is

damage to the common bile duct."

 Defendant's experts, Dr. Richard Koehler and Dr. Josef

Fischer, both testified that cutting the common bile duct was a

recognized complication of laparoscopic cholecystectomy and not

a deviation from the standard of care. Defendant's counsel

 8 A-0090-15T2
elicited testimony from each of them that they tell their

patients that injury to the common bile duct is a risk of

complication of the procedure and that it is in every consent

form.

 Over plaintiff's objection, the judge admitted Dr.

Koehler's consent form, which includes "possible injury to

common bile duct requiring endoscopic or surgical repair" as one

of the risks of the procedure. Dr. Koehler testified that

although transecting the common bile duct was "very uncommon,"

he includes injury to the common bile duct in his standard

consent form because "[i]t is a part of the human anatomy that

has wide variations" and "I want to make sure the patient

understands that." Dr. Koehler agreed with plaintiff's counsel

that "when he tell[s] a patient one of the risks, for example is

injury to a bowel or a blood vessel or to the bladder, [he]

certainly [isn't] telling them that [he's] going to commit

malpractice."

 Dr. Koehler testified that in his opinion, a surgeon seeing

and cutting what he thinks is the cystic duct, but instead is

the common bile duct is not negligence, because

"misidentification is not malpractice." The trial judge

prohibited plaintiff's counsel from impeaching Dr. Koehler on

cross-examination with the Society of American Gastrointestinal

 9 A-0090-15T2
and Endoscopic Surgeons Manual, notwithstanding the doctor had

acknowledged it as authoritative during his deposition, based on

the judge's understanding that plaintiff's counsel "had an

obligation to provide [his adversary with what he planned to

reference] in the form interrogatories."

 Dr. Fischer, a distinguished professor at Harvard Medical

School and author of textbooks on surgery, testified that injury

to the common bile duct during laparoscopic gallbladder surgery

is "a complication that can happen in the best of hands." He

contended that only thirty-five percent of gallbladders are in

the configuration contained in textbooks and that anomalies such

as a short cystic duct, limitations on a surgeon's field of view

in a laparoscopic procedure, and the presence of fat, which

"obscures your view" all contribute to a surgeon not correctly

identifying the structures to be clipped and cut.

 Dr. Fischer testified that although common bile duct

injuries are reported to occur in .4 to .7 percent of

laparoscopic gallbladder cases, new research suggests it is as

high as 1.9 to 4 percent. He testified, "[n]ow if there are

injuries to the common duct or whatever they are of 4 percent,

then it becomes something which is a matter of course of that

operation and not practice below the standard."

 10 A-0090-15T2
 On cross-examination, Dr. Fischer testified that in his

view, defendant erred by not

 looking for the cystic duct and the cystic
 artery when he should have. I think that
 was the error in this, he went first and
 clipped what turned out to be the common
 duct. I think that was the error. And
 then, if you read the [operative] note
 carefully and it's a difficult [operative]
 note to read, then he went and he looked at
 the cystic artery and what he thought was
 the cystic duct. And then concluded that
 the cystic artery bifurcated and that is a
 known anomaly.

 When plaintiff's counsel asked why that was not

malpractice, Dr. Fischer responded:

 Well, you know, if we have incidents of
 injury to common ducts and other aspects and
 we've been doing laparoscopic
 cholecystectomies for 20 years. And we
 still have a significant incidence of injury
 to the common duct. And these are people
 who are experienced people.

 I think what you have to say [is] that
 there's something wrong with the operation,
 which is my view. And why I have suggested
 to [the] American College of Surgeons is
 that we stop doing laparoscopic
 cholecystectomies until we can come to some
 conclusion with the legal profession as to
 what is appropriate for compensation and get
 it out of the court system. We have done
 that with other things.

 Plaintiff's counsel followed up by asking the witness if he

had "ever spoken before [any] committees, State Legislatures,

[or] Congress on the topic of tort reform?" Defendant

 11 A-0090-15T2
immediately objected. The court sustained the objection and

also sustained defendant's objection to plaintiff's next

question, which was "You think there's a better way to handle

the medical malpractice cases[?]" The court ruled that

plaintiff would be permitted to cross-examine the doctor "as to

his opinion and his direct testimony but this is an explanation

of his political views."

 Although the trial judge had already denied defense

counsel's motion to play the unredacted tape of Dr. Rodriguez-

Davalos's first de bene esse deposition when plaintiff put it in

evidence, ruling that Judge Quinn's pre-trial order remained law

of the case, the trial judge permitted defendant to read the

doctor's second deposition to the jury in the defense case,

notwithstanding that it contained comments nearly identical to

the ones excised by Judge Quinn. Specifically, plaintiff's

counsel objected to inclusion of the following testimony.

 Q: How often do you find or does the
 literature reflect finding any variations in
 the anatomy? Is that very rare that there
 are variations in the biliary anatomy, or it
 is well known that there are such
 variations?

 A: As I mentioned, it's well known. It's
 not rare. And again, any board certified
 surgeon in the country knows that these
 variations exist. And we know that, all of
 us that do biliary surgery or everybody that
 does cholecystectomies know that these are

 12 A-0090-15T2
variations that are hard to define
preoperatively and, therefore, all of us are
at risk of having a complication. That's
what makes this surgery so serious.

Q: Serious in what — can you elaborate a
little bit more by what you mean by "that's
what makes this surgery so serious"?

A: Right. Because if you have a surgery
that is performed, you know, so commonly and
you have an injury of zero point four to
zero point six percent, then you know that
there's a large number of patients that will
have bile duct injury on series that have
been described nationwide and
internationally. We know that this is one
of the common things we face as surgeons,
not only hepatobiliary surgeons, like
myself, but any general surgeon that does
gallbladder surgery knows.

 And we discuss this with our patient
before going to the operating room that, you
know, there is a zero point four to zero
point six percent chance of having an
injury, and the injury can be across the
spectrum. It can be a small injury that may
just require a drainage, like [plaintiff]
had at the beginning. It could be injury
that actually transects or divides the whole
ductile system. There are cases where, not
only the common bile duct and the common
hepatic duct are injured, but also the
hepatic artery, the portal vein. There are
patients that need a transplant because of
this type of surgery.

 So, therefore, it is a serious
complication, although it’s a complication
that can happen to any surgeon that performs
laparoscopic cholecystectomy or open
cholecystectomy.

 13 A-0090-15T2
 The trial judge permitted the testimony, although noting

"[i]f it was standard of care rather than diagnosis maybe my

ruling would be different." The judge ruled the testimony was

"placing in context . . . the treatment [plaintiff] received

before. And putting into context her complaints to him so he's

in a position to assess those. I think that's all part of the

diagnosis and prognosis that Stigliano1 talks about." The judge

also permitted defense counsel to read to the jury what Dr.

Rodriguez-Davalos testified he advises his own patients

regarding the risks attendant to a laparoscopic cholecystectomy

and that bile duct injuries "can really happen to any surgeon[,]

[e]ven surgeons with very high expertise."

 Plaintiff appeals, contending the trial judge erred in

permitting Dr. Rodriguez-Davalos to offer liability opinions

contrary to Stigliano and two prior orders in the case, in

admitting evidence of informed consent in a case in which there

was no informed consent claim, and in improperly limiting her

cross-examination of the defense experts. She also contends the

defense experts offered net opinions without factual support.

Because we agree with plaintiff's first two points, we reverse

the verdict and deny defendant's cross-appeal that the pre-trial

1
 Stigliano v. Connaught Labs., Inc., 140 N.J. 305 (1995).

 14 A-0090-15T2
orders relating to Dr. Rodriguez-Davalos' testimony were issued

in error. We address plaintiff's remaining arguments only for

guidance on re-trial.

 The law regarding the limits of a treating physician's

testimony at trial is well settled. As our Supreme Court

recently observed, "[o]ur courts have long permitted treating

physicians to offer medical testimony regarding the diagnosis

and treatment of their patients, pursuant to N.J.R.E. 701."

Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 576 (2016);

Stigliano, supra, 140 N.J. at 314. The Court established that

precedent in Stigliano, which continues to guide questions

regarding the trial testimony of treating doctors. Delvecchio,

supra, 224 N.J. at 577-79.

 In Stigliano, the plaintiffs' child experienced a seizure

after her pediatrician administered a DPT shot. 140 N.J. at

307. The plaintiffs subsequently took the child to three

pediatric neurologists for diagnosis and treatment. Id. at 308.

All three concluded the child suffered from a chronic or primary

seizure disorder, not caused by the DPT shot. Ibid. In the

plaintiffs' suit against the pediatrician and the maker of the

DPT vaccine, the plaintiffs secured a pre-trial ruling barring

the treating neurologists from testifying as to their opinions

as to the cause of the child's seizures. Id. at 309-10. The

 15 A-0090-15T2
Supreme Court disagreed, holding the neurologists, although no

doubt experts in their field, were fact witnesses in the case

who "may testify about their diagnosis and treatment of [the

child's] disorder, including their determination of that

disorder's cause." Id. at 314. The Court reasoned that

"[b]ecause the determination of the cause of a patient's illness

is an essential part of diagnosis and treatment, a treating

physician may testify about the cause of a patient's disease or

injury." Ibid.

 In holding a treating doctor may be called by a defendant

to testify about the cause of the plaintiff's illness, the Court

distinguished Piller v. Kovarsky, 194 N.J. Super. 392 (Law Div.

1984) and Serrano v. Levitsky, 215 N.J. Super. 454 (Law Div.

1986), two cases in which trial courts had prohibited treating

physicians from offering opinions regarding the negligence of

the defendant doctors. The Court observed that "Piller and

Serrano differ significantly on the facts. In those cases, the

defendant-doctors sought to ask the treating physicians not

about their treatment of the plaintiffs, but about the

defendant's alleged malpractice." Stigliano, supra, 140 N.J. at

315.

 Defendant did the same thing here. Plaintiff consulted Dr.

Rodriguez-Davalos for diagnosis and treatment of her symptoms of

 16 A-0090-15T2
nausea, vomiting and jaundice several days post a laparoscopic

cholecystectomy. Upon conducting an open surgical procedure, he

discovered her common bile duct had been transected. Upon

making that diagnosis, Dr. Rodriguez-Davalos treated plaintiff

by effecting a surgical repair. The doctor could certainly

testify that the cause of plaintiff's problem was a severed bile

duct. How it happened and why it happened, or that it could

have happened to the best of surgeons, however, are beyond the

scope of what this fact witness could offer the jury and should

not have been permitted. See N.J.R.E. 701; Stigliano, supra,

140 N.J. at 314.

 Judge Quinn was correct to excise all statements by Dr.

Rodriguez-Davalos regarding the difficulties faced by surgeons

performing laparoscopic cholecystectomies and the standard of

care, including that cutting the wrong duct was not an

"uncommon" problem and "could happen to any surgeon in the

country." The trial judge erred in not staying that course when

he permitted defendant to read into the record nearly identical

comments from Dr. Rodriguez-Davalos's second deposition. The

comments went well beyond the doctor's own diagnosis or

treatment of plaintiff, and defendant could not fairly use this

fact witness to "plac[e] in context . . . the treatment

[plaintiff] received before."

 17 A-0090-15T2
 Simply stated, medical malpractice defendants may not use

the plaintiff's treating doctors to provide expert testimony

relating to deviation from the standard of care. See Carchidi

v. Iavicoli, 412 N.J. Super. 374, 382 (App. Div. 2010). "[T]hat

Dr. Rodriguez-Davalos's substantial experience leads him to

describe the common bile duct as being so close to and running

parallel to the cystic duct that it is not uncommon for them to

be confused and misidentified," as defendant argues, is no basis

for the admission of that testimony from a treating doctor.

Those opinions were plainly not "inextricably intertwined" with

Dr. Rodriguez-Davalos's "examination, diagnosis, treatment plan

and cause determination," Carchidi, supra, 412 N.J. Super. at

382-83, but concerned only defendant doctor's alleged

malpractice, and were thus inadmissible.

 Having reviewed the record, we cannot dismiss the error as

harmless. See R. 2:10-2; Hisenaj v. Kuehner, 194 N.J. 6, 12

(2008). In crafting the rule established in Stigliano, the

Court recognized that "[a] jury could find the treating doctors'

testimony to be more impartial and credible than that of the

retained experts" as they could very likely be "the only medical

witnesses who have not been retained in anticipation of trial."

Stigliano, supra, 140 N.J. at 317.

 18 A-0090-15T2
 In making his closing argument to the jury, defense counsel

told the jury over and over that Dr. Rodriguez-Davalos, who "is

not involved in this suit in any way other than he does the

repair," who "certainly doesn't have any interest in getting

involved in this and criticizing anybody," who is just here to

"tell the truth," who "doesn't have any reason to favor anyone

in this case," and that "[t]his is his patient," said, "[t]his

could happen to anyone, I read it to you yesterday. This could

happen to anyone. All of us are at risk of having a

complication. It's a complication that can happen to any . . .

surgeon that performs this operation."

 Counsel went on to quote Dr. Rodriguez-Davalos on the

number of gallbladder surgical injuries annually, the vagaries

of the biliary system and his view of an intraoperative

cholangiogram, a technique employed in the course of a

laparoscopic cholecystectomy to delineate the anatomy of the

biliary ducts that Dr. Drew opined defendant could have used

here. Given how extensively the doctor was permitted to testify

beyond the scope of his own diagnosis and treatment and defense

counsel's reliance on that testimony in summing up to the jury,

we conclude the error was "clearly capable of producing an unjust

result" and entitles plaintiff to a new trial. See R. 2:10-2.

 19 A-0090-15T2
 We also conclude the court erred in admitting evidence of

informed consent in a case in which there was no informed

consent claim. Over plaintiff's objection, the trial judge

admitted defendant's testimony regarding his discussion with

plaintiff of the risk of injury to the common bile duct prior to

surgery; Dr. Koehler's consent form and what he tells his

patients of the risk of bile duct injury; Dr. Fischer's

testimony that a common bile duct injury is part of every

gallbladder surgeon's consent form; testimony by Dr. Rodriguez-

Davalos as to his consent form and his advice to patients of the

risk of injury to the bile duct prior to surgery; and the cross-

examination of plaintiff's expert, Dr. Drew, regarding what he

tells his own patients about the risk of complications to the

common bile duct in the course of laparoscopic cholecystectomy.

 The trial judge admitted the testimony based on his belief

that excluding it "would lead a jury to infer that [defendant]

took no steps to explain the procedure, or could lead to the

conclusion that a juror or all the jurors could infer that there

was a lack of explanation of the significance of the surgery."

The judge ruled he would not "preclude . . . defendant from

effectively advancing a defense to the complaint that's been

made against him." Although we certainly agree that defendant

is entitled to defend himself against the complaint "made

 20 A-0090-15T2
against him," the question is whether he may mount such a

defense when plaintiff has made no such complaint.

 A patient's right to be informed about medically reasonable

treatment alternatives and their attendant risks is separate and

distinct from a cause of action predicated on a physician's

breach of a standard of care, notwithstanding both are a form of

medical negligence. Matthies v. Mastromonaco, 160 N.J. 26, 39

(1999). Although when the claims are brought together the facts

underlying them can be "intertwined," there is no question but

that they are different claims having different elements of

proof. See Newmark-Shortino v. Buna, 427 N.J. Super. 285, 303-

04, 308 (App. Div. 2012), certif. denied, 213 N.J. 45 (2013).

"[T]he informed-consent basis of malpractice, as opposed to

deviation from the applicable standard of care, rests not upon

the physician having erred in diagnosis or administration of

treatment but rather in the failure to have provided the patient

with adequate information regarding the risks of a given

treatment or with adequate information regarding the

availability of alternative treatments and the comparative risks

and benefits of each." Eagel v. Newman, 325 N.J. Super. 467,

474-75 (App. Div. 1999).

 Relying on out-of-state authority, plaintiff contends that

her having been advised of the risk of bile duct injury and

 21 A-0090-15T2
having consented to the laparoscopic cholecystectomy is

irrelevant to the issue of whether defendant deviated from the

standard of care in performing the procedure. She claims the

extensive testimony and evidence presented on informed consent

unduly prejudiced her in two ways. It diverted the jury's

attention from the claim she actually brought, that is whether

defendant deviated from the standard of care in performing the

surgery, and it allowed defendant to implicitly make the

improper argument that having been advised of the possibility of

bile duct injury and having consented to the surgery, she

assumed the risk.

 Defendant counters that "[w]hile plaintiff frames the

references" made at trial "to the various surgical consent forms

and the explanations" provided plaintiff of the risks of

surgery, including bile duct injury, "as attempts to convert the

case to one of informed consent, the clearly expressed basis for

that evidence was to show the jury that bile duct injury was a

known and recognized risk of a laparoscopic cholecystectomy."

Defendant cites Dr. Koehler's testimony that injury to the

common bile duct, though uncommon, is a recognized complication

of the procedure and thus must be discussed with the patient as

an example of how such testimony was relevant even in the

absence of an informed consent claim.

 22 A-0090-15T2
 In a recent decision considering whether the admission of

informed consent evidence in the absence of an informed consent

claim is reversible error, we followed the unanimous view of the

state courts that have considered the question that such

evidence is irrelevant to whether the doctor provided negligent

treatment and that its admission risks undue prejudice to

patients. See Ehrlich v. Sorokin, ___ N.J. Super. ___ (App.

Div. 2017) (slip op. at 11-15).

 The plaintiff in Ehrlich claimed the defendant doctor

negligently performed a colonoscopy and polypectomy procedure,

burning her colon and causing a perforation. Id. at 4. She did

not bring an informed consent claim. Ibid. The doctor denied

any negligence, claiming any colonoscopy carries a risk for

perforation, and "burning a colon is a 'known complication of

the use of [the APC] [Argon Plasma Coagulation] for the

performance of colonoscopy.'" Id. at 7.

 The trial court denied plaintiff's in limine motion to

exclude evidence of informed consent and, over her objection,

permitted the jury to review the informed consent forms she

signed in its deliberations. Id. at 4-5, 7-8. Correcting his

earlier statement that the documents went "to the standard of

care," the judge ruled that "in a fundamental sense, there could

be no way to have a fair trial that would allow the plaintiff to

 23 A-0090-15T2
explore this treatment . . . , including almost every single

statement written by Dr. Sorokin, and exclude the informed

consent." Id. at 8. We disagreed.

 Relying on a recent case from the Pennsylvania Supreme

Court finding that a patient's agreement "'to a procedure in

light of the known risks does not make it more or less probable

that the physician was negligent in either considering the

patient an appropriate candidate for the operation or in

performing it in the post-consent timeframe,'" as well as

several other out-of-state cases holding generally that evidence

of informed consent is irrelevant and potentially prejudicial

where the issue is negligent treatment, we reversed.2 Id. at 12-

13 (quoting Brady v. Urbas, 111 A.3d 1155, 1162 (Pa. 2015)). We

reasoned in line with that general authority that Ehrlich's

acknowledgment of the risk for perforation "had no bearing" on

the only issue at trial, whether Dr. Sorokin "use of the APC

without a saline lift deviated from the standard of care." Id.

at 14. We also concluded the evidence had the capacity to

2
 We also relied on our own analogous precedent in Gonzalez v.
Silver, 407 N.J. Super. 576, 593-95 (App. Div. 2009), in which
we barred on re-trial plaintiff's statement to defendant doctor
that plaintiff injured his elbow "car surfing" because of the
statement's irrelevance to the diagnosis and treatment of
plaintiff's elbow injury and its "enormous potential for
prejudice," outweighing the worth of the evidence for
impeachment purposes. Ehrlich, supra, slip op. at 13-14.

 24 A-0090-15T2
mislead the jury into reasoning that Ehrlich's consent to the

procedure implied a consent to the resulting injury, making it

lose sight of the central question of whether the defendant

doctor's actions conformed to the standard of care. Id. at 15.

 We agree with the reasoning of Ehrlich and follow it here.

Plaintiff's knowledge of the risk of bile duct injury in the

course of a laparoscopic cholecystectomy is entirely irrelevant

to whether defendant performed the procedure in accordance with

the applicable standard of care. As the Supreme Court of

Virginia has succinctly explained:

 Knowledge by the trier of fact of informed
 consent to risk, where lack of [in]formed
 consent is not an issue, does not help the
 plaintiff prove negligence. Nor does it
 help the defendant show he was not
 negligent. In such a case, the admission of
 evidence concerning a plaintiff's consent
 could only serve to confuse the jury because
 the jury could conclude, contrary to the law
 and the evidence, that consent to the
 surgery was tantamount to consent to the
 injury which resulted from that surgery. In
 effect, the jury could conclude that consent
 amounted to a waiver, which is plainly
 wrong.

 [Wright v. Kaye, 593 S.E.2d 307, 317 (Va. 2004).]

 We reject defendant's argument that the informed consent

evidence could assist in either establishing the standard of

care for the procedure or bolstering his claim that plaintiff's

transected bile duct resulted from a recognized complication of

 25 A-0090-15T2
the procedure and not negligence. A patient's knowledge of the

risks of a surgical procedure obviously cannot establish the

standard of care for the physician performing it. See Velazquez

v. Portadin, 163 N.J. 677, 686 (2000) (defining a physician's

standard of care as "that degree of care, knowledge, and skill

ordinarily possessed and exercised in similar situations by the

average member of the profession practicing in the field").

Likewise, that a recognized complication of a surgical procedure

occurred says nothing about whether it could have been avoided

by the surgeon's exercise of reasonable care.

 Certainly, the known risks of a surgical procedure are

relevant to the standard of care applicable to a surgeon

performing the procedure. See Hayes v. Camel, 927 A.2d 880, 890

(Conn. 2007) (noting that "evidence of the risks of a surgical

procedure is relevant in the determination of whether the

standard of care was breached"). And defendant is, of course,

free to argue to the jury that common bile duct injuries can

occur in the course of a laparoscopic cholecystectomy in the

absence of negligence. We, however, agree with those courts

that have determined that presenting such evidence through the

vehicle of informed consent poses enormous risks of jury

confusion. See Ehrlich, supra, slip op. at 15-16. Such

evidence can readily be presented clearly and without confusion

 26 A-0090-15T2
through the testimony of a defense expert regarding the risks of

the procedure, without reference to what advice the expert

provides patients or what plaintiff was told of the risks of the

surgery. See, e.g., Hayes, supra, 927 A.2d at 890; Waller v.

Aggarwal, 688 N.E.2d 274, 276 (Ohio Ct. App. 1996).

 We agree with plaintiff that the informed consent evidence

at trial was unduly prejudicial to her. In addition to the

informed consent testimony elicited from defendant and all of

the experts in the case, defendant's counsel highlighted the

testimony and defendant's advice to plaintiff regarding the

risks repeatedly in his closing argument, asking the jury:

 Do you think he's telling her, hey I may
 commit malpractice on you? Or is he telling
 her the possible risks, known risks and
 complication[s] which he has a duty to do
 which he did do.

 Although defendant undoubtedly has the right to defend

himself against the complaint made against him, he does not have

the right to set up a straw man argument against the complaint

he would rather defend, diverting the jury's attention from the

negligent treatment claim plaintiff brought, and improperly

suggesting to the jury that having been advised of the

possibility of bile duct injury and having consented to the

surgery, plaintiff assumed the risk.

 27 A-0090-15T2
 Given our disposition of the appeal, we need not resolve

plaintiff's remaining points of error. We comment briefly only

on those issues that might occur on re-trial.

 Regarding the use of learned treatises, the Supreme Court

in Jacober v. St. Peter's Medical Center, 128 N.J. 475, 490-91

(1992) established that experts may "refer on direct examination

to statements from learned treatises if they relied on those

treatises in forming their opinions." See N.J.R.E. 803 (c)(18).

With regard to Dr. Drew's reliance on sections of the Mastery of

Surgery text edited by Dr. Fischer, one of defendant's experts,

we are not aware of any requirement that such reliance must be

demonstrated exclusively in the expert's report, as opposed to

his deposition testimony. As for plaintiff's employment of the

Society of American Gastrointestinal and Endoscopic Surgeons

Manual on cross-examination of Dr. Koehler, because plaintiff

employed it to impeach the witness, notice was not required.

See Form A(1) Uniform Interrogatories #10, Pressler & Verniero,

Current N.J. Court Rules, Appendix II to R. 4:17-1 at

www.gannlaw.com (2017).

 Regarding the trial judge's refusal to allow plaintiff's

counsel to cross-examine Dr. Fischer on his views of tort reform

after he testified that he had "suggested to [the] American

College of Surgeons . . . that [surgeons] stop doing

 28 A-0090-15T2
laparoscopic cholecystectomies until we can come to some

conclusion with the legal profession as to what is appropriate

for compensation and get it out of the court system," we need

not decide whether we would reverse such a ruling in light of

the trial court's broad discretion to control cross-examination.

See Delgaudio v. Rodriguera, 280 N.J. Super. 135, 141 (App. Div.

1995).

 We note, however, that the scope of cross-examination

concerning bias is also broad, and that N.J.R.E. 607 expressly

permits a party to introduce extrinsic evidence for the purpose

of impairing the credibility of a witness. If what the trial

judge characterized as Dr. Fischer's "political views" informed

his opinion on the standard of care, then those views would

appear a proper subject of cross-examination, the standard being

its effect "upon substantial justice." Glenpointe Assocs. v.

Twp. of Teaneck, 241 N.J. Super. 37, 55 (App. Div.), certif.

denied, 122 N.J. 391 (1990).

 Finally, we address plaintiff's contention that Dr.

Fischer's was a net opinion because it was without factual

support in the record. Because defendant did not move to strike

Dr. Fischer's testimony at trial, the issue is not properly

before us. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234

(1973). If such a motion is made on re-trial, the court must

 29 A-0090-15T2
consider whether there is any factual support in the record for

Dr. Fischer's opinion that plaintiff had a short cystic duct in

light of defendant's testimony that "it looked like a perfectly

appropriate cystic duct. There was no indication [that it was

shorter than normal]." See Townsend v. Pierre, 221 N.J. 36, 55

(2015) (holding an expert opinion that is unsupported by the

factual record or based on an expert's speculation that

contradicts that record constitutes net opinion).

 Reversed and remanded. We do not retain jurisdiction.

 30 A-0090-15T2